**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-315

ANDREA DAS,

      Plaintiff,

v.

ALDASORO RANCH HOMEOWNERS COMPANY, a Colorado Nonprofit Corporation,
KEVIN HOLBROOK,
JESSE LOESEKAN,
DAVID JEMISON
and JODIE WRIGHT, Individually

      Defendants.

---

## COMPLAINT

---

COMES NOW, PLAINTIFF ANDREA DAS ("Das" or "Plaintiff") complaining of

Defendants Aldasoro Ranch Homeowners Company, a Nonprofit Corporation ("ARHOC"), Kevin

Holbrook ("Holbrook"), Jesse Loesekan ("Loesekan"), David Jemison ("Jemison") and Jodie

Wright ("Wright") (collectively "Defendants"), and in support alleges and pleads the following:

**I.
SUMMARY OF DISPUTE**

1.      In brief summary, this suit arises out of conduct and actions by a homeowners

association (ARHOC), three (3) members of the ARHOC Board of Directors ("BOD") (Holbrook,

Loesekan and Jemison), and one (1) member of the ARHOC Design Review Board ("DRB")

(Wright) with respect to the improper granting of a Building Site Relocation ("BSR") from an

established and designated building site (described and defined for each Lot in the Building Site

Boundary Covenant) and the granting of Limited Waivers ("Waivers") allowing unwarranted deviation of required design regulations at the expense and detriment of and economic injury to the Plaintiff (Lot 50).

2.      The conduct and acts of the Defendants with respect to the granting of the BSR and Waivers are in violation of Governing Documents (as defined below) and applicable law. The criteria and process set forth in the Governing Documents and utilized by the Defendants with respect to a BSR and Waivers violate due process standards and amount to an unlawful taking/conversion of private property without just compensation.

3.      Das, by and through her counsel, Garfield & Hecht, P.C. and Tyler & Das, hereby alleges and pleads upon personal knowledge with respect to acts attributable to her, and upon information and belief as to all other matters, as follows:

## II.
## THE PARTIES

4.      Das is an individual and a resident and a citizen of the State of Texas.  Das owns the real property at issue in this lawsuit, which is located in Telluride, San Miguel County, Colorado, commonly known as Lot 50 in Aldasoro Ranch or 107 Aguirre Road, Telluride, Colorado.

5.      ARHOC is a Colorado nonprofit corporation with its principal office at 307 Society Drive, Unit C, Telluride, San Miguel County, Colorado 81435.  This Defendant can be served through its registered agent: Aldasoro Ranch Homeowners Company at 307 Society Drive, Unit C, Telluride, Colorado 81435.

6.      Holbrook is an individual and a resident and citizen of the State of Colorado. Holbrook is presently and was during relevant periods of time a member of the ARHOC BOD and

served in the capacity of President.  Holbrook can be served at his place of business at 137 W Colorado Ave., Telluride, Colorado 81435 or where he may be found.

7.      Loesekan is an individual and a resident and citizen of Colorado.  Loesekan was during relevant periods of time a member of the ARHOC BOD.  Loesekan has recently resigned from the ARHOC BOD and now appears to have taken a paid, part time position as "HOC DRB Coordinator (part-time)."  Loesekan can be served at her place of residence and business at 3 Boulder Way, Telluride, Colorado 81435 or where she may be found.

8.      Jemison is an individual and a resident and citizen of the State of Colorado. Jemison is and was during relevant periods of time a member of the ARHOC BOD.  Jemison can be served at his place of residence at 107 Joaquin Road, Telluride, Colorado 81435 or where he may be found.

9.      Holbrook, Loesekan and Jemison are sometimes collectively referred to as the "BOD Defendants."

10.     Wright is an individual and a resident and citizen of Colorado.  Wright is and was during relevant periods of time a member of the ARHOC DRB.  Defendant Wright can be served at her place of business at 560 West Pacific Avenue, Telluride, Colorado 81435 or where she may be found.  Wright is sometimes referred to as the "DRB Defendant."

### III.
### JURISDICTION AND VENUE

11.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is "complete diversity" of citizenship as is required for the assertion of federal diversity jurisdiction.  Das is a Texas resident and citizen whereas all Defendants are

Colorado residents and citizens.  Additionally, the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12.     This Court also has original subject matter jurisdiction under 28 U.S.C. § 1331, in that Plaintiff asserts, *inter alia*, a claim for declaratory judgment under Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201, *et seq.*

13.     The causes of action and/or claims for relief asserted herein, to the extent they are premised upon state laws, are subject to this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

14.     Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because all Defendants are residents of this district, the acts and/or omissions giving rise to the claims asserted herein occurred in this district, and because the real property at issue is located in this district.

## IV.
## CONDITIONS PRECEDENT

15.     All conditions precedent to Das' right to recovery under all claims for relief set forth herein have been performed and/or occurred and/or waived prior to the filing of this lawsuit.

16.     Das has complied with all required alternative dispute resolution policies and procedures of the Defendants.

## V.
## ALDASORO RANCH

17.     Aldasoro Ranch is a Planned Unit Development covenant-controlled common ownership interest high-end residential community located in unincorporated San Miguel County northwest of the Town of Telluride that is made up of approximately 167 individually owned

single-family homes and undeveloped lots (collectively, the "Lots"), as well as tracts of land dedicated as open space (together "Aldasoro Ranch").

18.     San Miguel County granted certain land use approvals allowing for the use and development of the Community ("County Approvals"), which are reflected in certain plats, agreements and other documents which have been recorded in the County Public Records ("County Approval Documents").  Development is further subjected to applicable provisions of the County Land Use Code and County Building Code ("County Law").

19.     The Community consists of certain platted residential Lots ("Lots" or "Sites"), each separately owned by a "Lot Owner" or "Owner" and certain "Open Space Parcels" or "Common Areas," roads and other infrastructure, owned, operated, managed and maintained by the Homeowners Company. The Lots and Open Space Parcels are as depicted and described in the Governing Documents. Each platted Lot includes an area established as a **"Designated Building Site,"** which is described and defined for each Lot in the Building Site Boundary Covenant. Improvements are required to be located within the Designated Building Site and in accordance with design regulations.

20.     Aldasoro Ranch is subject to and governed by an incorporated owners' association known as ARHOC charged with administering common ownership matters pursuant to the Governing Documents (defined below). ARHOC, a homeowner's association has a fiduciary duty to homeowners, such as Plaintiff. "This duty has been imposed in recognition of the power held by homeowner[s'] association, the quasi-governmental functions they serve, and the impact on value and enjoyment that can result from the failure to enforce covenants." *Colo. Homes, Ltd. v. Loerch-Wilson,* 43 P.3d 718, 722 (Colo. App. 2001).

21.     For purposes of this Complaint, the "Governing Documents" of Aldasoro Ranch

consist of, *inter alia,* the following:

(a)     General Declaration for the Aldasoro Ranch, recorded on August 5, 1991 in Book 480 at page 817; First Supplement recorded on April 9, 1992 in Book 490 at page 413; Second Supplement recorded on May 15, 1992 in Book 492 at page 149; First Amendment recorded on May 15, 1992 in Book 492 at page 152; Third Supplement recorded on January 29, 1993 in Book 505 at page 322; Fourth Supplement recorded on April 25, 1995 in Book 545 at page 70; Second Amendment recorded on August 6, 1996 in Book 565 at page 783; the Third Amendment thereto recorded November 13, 2003 at Reception no. 361929, as re-recorded February 9, 2005 at Reception no. 372380, the Fourth Amendment thereto recorded February 22, 2005 at Reception no. 372729, the Fifth Amendment thereto recorded April 17, 2008 at Reception no. 401002, the Declaration Amendment recorded on July 12, 2016 at Reception No. 443145, as may be further amended or supplemented from time to time ("Declaration");

(b)     The Aldasoro Ranch Planned Unit Development ("PUD") recorded on February 8, 1991 at Reception no. 269515; First Technical Amendment thereto recorded March 21, 1991 at Reception no. 269974, Amendment thereto recorded December 29, 2005 at Reception no. 380579, Resolution by San Miguel County Commissioners 2010-7 recorded on January 31, 2011 at Reception no. 416225, Resolution by the San Miguel County Commissioners 2016-5 recorded on July 12, 2016 at Reception no. 443143, Amendment recorded July 12, 2016 at Reception no. 443144;

(c)     Final Plat for Aldasoro Ranch Filing No. 1, recorded on August 5, 1991 in Plat Book 1 at page 1153; Final Plat for Aldasoro Ranch Filing No. 2, recorded on January 29, 1993 in Plat Book 1 at page 1406; Final Plat for Aldasoro Ranch Filing No. 3, recorded on April 25, 1995 in Plat Book 1 at page 1830 as further amended or supplemented; and PUD Plat Amendment recorded on January 11, 2011 in Plat Book 1, Page 4431 Reception No. 416228, as may be further amended or supplemented from time to time ("Plat");

(d)     Building Site Boundary Covenant for Aldasoro Ranch Filing No. 1, recorded on August 5, 1991, in Reception No. 272006; Building Site Boundary Covenant for Aldasoro Ranch Filing No. 2, recorded on January 29, 1993, in Reception No. 282499 and re-recorded on

December 19, 1997 in Reception No. 316108; Building Site Boundary Covenant for Aldasoro Ranch Filing No. 3, recorded on April 25, 1995 in Reception No. 298553; and First Amendment to the Filing 1, Filing 2 and Filing 3 Building Site Boundary Covenant recorded on August 7, 1997, in Reception No. 313781 (collectively, the "Building Site Covenant"). **Each platted Lot has been designated with a certain "Designated Building Site" within which the Residence, Accessory Structure, Accessory Housing Units and other Improvements as provided for in the Governing Documents must be located**;

(e)     Building Height Covenant for Filing No. 2, recorded on January 29, 1993, in Reception No. 282500; Building Height Covenant for Filing No. 3, recorded on April 25, 1995 in Reception No. 298555 (collectively, the "Building Height Covenant"). There are no Building Height Covenants filed for Lots in Filing No. 1. The Building Height Covenant identifies the Lots in the Community that are designated as a Height Limitation Lot, for which certain height limitations and restrictions are established;

(f)     The Articles of Incorporation, the Bylaws for the Homeowners Company, the Aldasoro Ranch Governance Policies, the Aldasoro Ranch General Rules and Regulations, the Aldasoro Ranch Policies and Procedures (Appeals of DRB Actions and Decisions), the Aldasoro Ranch Policies and Procedures (Dog Control Regulations and Policies), the Aldasoro Ranch Policies and Procedures (Open Space Usage), the Aldasoro Ranch Policies and Procedures (Rental Policies), the Aldasoro Ranch Policies and Procedures (Road Usage), the Aldasoro Ranch Water Operations Rules and Regulations and any other adopted policies, rules and regulations adopted by the Homeowners Company;

g)     The Second Amended And Restated Governance Policies And Procedures of The Aldasoro Ranch Homeowners Company, A Colorado Nonprofit Corporation of May 24, 2018 ("2nd Amended and Restated Governance Policies and Procedures");

h)     The Amended and Restated Design Review Rules and Regulations of the Aldasoro Ranch Subdivision/PUD ("Design Regulations)

adopted and effective December 1, 2017 (the "2017 DRB Regulations")[1]; and

i)  Those documents which have been recorded with the San Miguel County Clerk and Recorder, and which have not been superseded or amended at the time the events made the basis of this claim arise and which impact or control Aldasoro Ranch and/or the Lots and which may meet the definition of C.R.S. § 38-33- 103(13).

22.     Aldasoro Ranch is governed (except to the extent providing greater protection to Das and increasing duties and responsibilities of the Defendants by way of Governing Documents) by the Colorado Common Interest Ownership Act, codified at C.R.S. §§ 38-33.3-101, *et seq.* (together, "CCIOA"), and ARHOC is governed by the Colorado Nonprofit Act at C.R.S. §§ 7-40-101, *et seq.* (the "Nonprofit Act").

# VI.
# ALDASORO RANCH BOARD OF DIRECTORS
# AND DESIGN REVIEW BOARD

23.     The affairs of Aldasoro Ranch are managed by its BOD (each, a ''Director''). Although the Board has the power to delegate authority, the ultimate responsibility for the governance of the corporation (ARHOC) resides with the BOD.

24.     To enforce the design review rules, procedures and protection for owners of the Lots in Aldasoro Ranch (the "Owners"), established the DRB. The members of the DRB are appointed by the BOD.

25.     The BOD and DRB are required to consist of five (5) regular members each to review, oversee and approve all design review matters within Aldasoro Ranch. Governing

---

[1] The Aldasoro Ranch DRB Regulations were amended after the events that form the basis of this claim and in part as result of the actions of the Defendants in this matter on and effective December 18, 2019 ("2019 DRB Regulations").

Documents of ARHOC place BSR - building site relocation - requests and Limited Waiver requests under the purview of design review matters, subject to BOD review. The Governing Documents also appear to permit the engagement of consultants with respect to a Lot Owner's request to build on a Lot, including a request for a BSR and/or a Limited Waiver.

26.     In this matter, Chris Hawkins with Alpine Planning, LLC was engaged and requested to provide interpretation and analysis, *inter alia*, of Governing Documents, impacts to Plaintiff (Lot 50), benefits to ARHOC and Lot 51 and "Staff Recommendation(s)" with respect to the issues at hand - BSR and Limited Waivers.

27.     While Governing Documents require the existence of five (5) regular members, in the instant matter only three (3) DRB Members were involved in the conduct at hand. The DRB chair, Jake McTique, while not citing a specific provision of Governing Documents and for what appears to be the avoidance of the appearance of impropriety, recused himself. Additionally, during BOD Review by way of an Appeal under Governing Documents, two (2) of the BOD Members, Kirk Young and John Cameron, recused themselves from participation in the Appeal to the BOD of the BSR and Limited Waivers granted by the DRB. Kirk Young recused himself due to "alleged" comments as to his views and bias against BSRs; John Cameron, who is a lawyer, recused himself so he could be shielded from any potential liability and serve as "special counsel" to the BOD and ARHOC with respect to the subject matter.[2]

---

[2] While recusing himself from participation in the Appeal of the BSR and Limited Waivers, Mr. Cameron did participate as a BOD member in the appointment (without proper notice and in violation of Colorado law) of DRB Member Craig Spring after his departure from the DRB for purposes of the instant matter and did and has continued to participate in other matters involving Plaintiff (Lot 50) and Lot 51.

28.     Pursuant to Governing Documents (including the 2nd Amended and Restated Governance Policies and Procedures), the BOD Directors and DRB Members (including Defendants Wright, Holbrook, Loesekan and Jemison) have the following duties and responsibilities:

2.1.    **Duty of Loyalty.** The duty of loyalty requires Directors to put the interest of the organization above any individual interests. It incorporates the basic principle of corporate law that Directors must not use their position for personal profit or other personal advantage. **Directors must (1) avoid conflicts of interest**, (2) ensure that any dealing between themselves and the organization is fair, (3) avoid preempting any business opportunity available to the organization, and (4) maintain the confidentiality of information made available to them as Directors until such time as that information has become a matter of public record or common knowledge. Directorship is a responsibility, not just an honor. A Director may make a valuable contribution through relevant inquiry and focused discussion of proposals initiated by management. However, **lack of objectivity and putting personal status and aspirations ahead of the needs of the organization may result in the misdirection of Board activity**. Directors should be prepared to oppose, if necessary, the position of dominant members of the Board. An individual should seek to become, or consent to be, a Director only if he or she is **sufficiently qualified and is prepared to devote the attention and effort necessary to fulfill the substantial responsibilities involved.**

2.2.    **Duty of Care.** The duty of care requires Directors to perform their duties, including service as a member of any committee, in good faith, in a manner they reasonably believe to be in the best interest of the organization, and **with the care an ordinarily prudent person in a like position would use under similar circumstances.**

. . .

2.3.    **Duty of Obedience.** Directors are obliged to follow the HOC's Governing Documents, including these policies, **applicable Colorado law**, and any policies that have been adopted by the Board. Directors can meet this duty by being familiar with the Governing Documents. They should seek legal advice when appropriate before taking action as a Board.

29.     Furthermore, Governing Documents (including the 2nd Amended and Restated Governance Policies and Procedures) require, *inter alia*, that BOD and DRB Members must meet and comply with, *inter alia*,, the following:

> 3.1.    **General Duty**. . . . [M]ake decisions that are consistent with high principles, and **to protect and enhance the value of properties of the members** . . . All Directors shall comply with all lawful provisions of the Declaration and the HOC's Articles, Bylaws, and Rules and Regulations [; and]
>
> [avoid] "Conflicting Interest Transactions" [including] as a contract, transaction or other financial relationship between the HOC and a Director of the HOC, or between the HOC and a party related to a Director, or between the HOC and an entity in which a Director of the HOC is an officer, director or other partner, member or manage or has a financial interest.

30.     Governing Documents (including the 2nd Amended and Restated Governance Policies and Procedures) require recusal of a BOD and/or DRB Member as follows:

> 3.3.    **Recusal of Directors or Design Review Board Members**. . . . A conflict of interest shall exist in the event that a Director or a member of the Design Review Board, in the review of a Design/use Application which involves: (a) property that is owned by the Director or DRB Member or their immediate family (i.e. husband/wife, parents, children, siblings), (b) **property owned by a person or an entity to whom the Director or DRB Member has a business relationship,** (c) instance where the Director or DRB Member received notice of the pending design/use Application and the Board Members property adjoins the property of the application, and (d) **instances where a Member of the DRB has acted on the design/use application while on the DRB and the matter is appealed to or otherwise being reviewed by the Board of Directors.** . . . The minutes of the meeting shall reflect the disclosures and recusals made, the composition of the quorum and record who voted for and against.
>
> 3.4.    The foregoing provisions of this Section 3 shall apply to DRB members to the extent that the context of the terms, conditions and provision of this Section would apply to actions expected to be taken by the DRB Members in accordance with the Governing Documents.

31.     Governing Documents (including the 2017 DRB Regulations and Procedure Rules) also require, when reviewing any Application required to be presented to and acted upon by the DRB in accordance with the Governing Documents, and these Design Regulations, that the DRB shall adhere to the following procedural requirements:

>  8.14   **DRB Procedural Rules.**
>
>  A.     The DRB shall identify any potential conflicts of interest that would **pose a bias for or against the pending Application and shall recuse himself/herself from considering the Application.** Grounds for bias and recusal would include: (i) ownership of property for which notice of the Application was required to be sent to the DRB member or their immediate family (ie. husband/wife, parents, children, siblings) or (ii) ongoing business relationships with the Applicant or an adjacent owner opposing the project.

32.     Governing Documents (including the Bylaws of the ARHOC) allow for compensation to the BOD stating:

>  6.5    **Compensation.** By resolution of the Board of Directors, any director may be paid any one or more of the following: his reasonable expenses incurred, if any, in furtherance of the business or affairs o (sic) the Homeowners Company; a fixed sum for attendance at meetings. No such payment shall prejudice any director from serving the Homeowners Company in any other capacity and receiving compensation therefor.[3]

---

[3] BOD minutes of February 26, 2008, reflect a motion and approval to amend the General Declarations and By-Laws to reflect the following:

> All Board of Directors members, after one year of service, be exempt from their yearly assessment for terms. This exemption is for only one lot and the member is required to attend, either in person or by conference calls 80 % of the meeting (sic) per year and must attend the Annual meeting in February. To be reviewed annually. If Board meetings are held less frequently than quarterly, a 100 % attendance is required. If a board member is re-elected to a board seat consecutively, then they will continue the exemption provided they meet the criteria previously stated.
>
> This completes the motion. Another motion or continuance of this motion could be to include the DRB members with 50% exemption due to a minimal carry over responsibilities from DRB meeting to DRB meeting and infrequency of actual meetings.

## VII.
## BUILDING SITE RELOCATIONS AND LIMITED WAIVERS

33.     According to Governing Documents, the Design Review Board ("DRB") is charged and directed to, *inter alia*, (i) Maintaining the Privacy/Views of Neighboring Properties; (ii) Protection of the Night Sky; (iii) Building Scale; and (iv) Protecting the Property Value of Lot Owners.

34.     Governing Documents require that the BOD and DRB enforce the Building Site Covenants, which were enacted to protect neighboring Owners from potentially adverse impacts that could result from improvements constructed on neighboring properties.

35.     Governing Documents require that any requests to change a building site location, size, height, or other restrictions must be addressed in the manner provided for in these Design Regulations [2017 DRB Regulations]. Every submission of an Application for approval of Improvements in connection with a Sketch Plan Review, Final Plan Review, Building Site Enlargement, Building Site Relocation [BSR] or Building Height Increase, must include, *inter alia*, the following: (a) Soils Report/Foundation Report and (b) Existing Conditions Survey.

36.     In addition to a BSR, Governing Documents provide for requests for Limited Waiver(s) from design regulations to be made to the DRB. Governing Documents also require that with respect to a request for a Limited Waiver that all such requests be done in accordance with the ARHOC's Governing Documents including Design Review Regulations. A request for a Limited Waiver shall:

> 8.17 **Requests for Limited Waive**r.
>
> . . . The request for a Limited Waiver must be clearly titled as a Request for a Limited Waiver, **cite the provision for which the Limited Waiver is sought and clearly state the reasons for the request.** The DRB may

approve a request for a Limited Waiver if the DRB, in its sole discretion, determines that the request does not materially deviate from the design goals and objectives of the Design Regulations and does not materially cause increased visual impacts on neighboring Lots or the Community and meets other criteria provided for in the Design Regulations which relate to the particular Limited Waiver.

37.     The Governing Documents also require that notice for any application for a BSR or Limited Waiver to be sent all Owners of a Lot in the Community ("Noticed Owners") located within 500 feet of the boundaries of the Lot (excluding the width of any intervening road ROW) upon which the Application has been submitted, as well as any Owners who sent a written notice to the Homeowners Company following the submission of the Application requesting that they be provided a copy of any notice of DRB review of a particular Application. Plaintiff, as an adjoining Lot Owner meets the definition of a Noticed Owner.

38.     Certain Final Actions of the DRB are subject to appeal to the Homeowners Company Board, as provided for in the Governing Documents. A Noticed Owner, such as Das – owner of Lot 50 – may bring an appeal of a Final Action of the DRB to the Homeowners Company Board, the subject matter of which are limited to the following types of Applications: (a) an action concerning a Building Site Relocation or Building Site Enlargement, (b) an action allowing a height increase on a Lot that is restricted by a Building Height Limitation covenant, and (c) an action approving a Limited Waiver concerning a waiver or variance from any standard of the design review rules and regulations ("Appealable Decisions").[4]

_____

[4] Under applicable Governing Documents, a Lot Owner d has no right to appeal a request for recusal of a DRB Member or BOD Director from any matter. ARHOC is currently in the process of amending the Governing Policies to address that omission.

39.     Governing Documents specifically requires that the Association, via the Board, promulgate and publish rules and regulations that shall be included in the DRB Regulations setting forth procedures to appeal DRB decisions.

**A.     Applicable Building Site Relocation Process**

40.     The relevant provisions of the Governing Documents as to a BSR provide in relevant part:

### 2.7.1. Maintaining the Privacy /Views of Neighboring Properties

**Privacy is an important factor and consideration in the design and layout of Improvements in the Community and should be understood to include the visual impact of any proposed building, as well as its effect on both sound and light pollution. . . . The burden shall lie on the Applicant proposing new development to minimize, and if practical, to avoid such adverse impacts.** To achieve these objectives, Applicants shall use commercially reasonable and customary efforts to conform with existing site requirements, and designated restrictions assigned to their Lot. Any requests by an Applicant to change their building site location, size, height, or other restrictions must be addressed in the manner provided for in these Design Regulations. . . . Where possible, the use of natural landscape features and the effort to build into the landscape, rather than have buildings placed on the landscape, is mandatory.

### 8.12.   Review of Request for a Building Site Enlargement or a Building Site Relocation.

8.12.1. The Building Site Boundary Covenant provides as follows:

*"Improvements, including but not limited to excavations, buildings, decks, patios, roof overhangs, play areas, swimming pools, tennis courts, and enclosed parking areas may not be located or constructed on the Lot outside of the corresponding Building Site Boundary. The DRB, in its sole discretion, may grant exception to this covenant; however, the DRB shall exercise its discretion cautiously. It is anticipated that only driveways, underground utilities, limited surface parking and landscaping will be allowed outside of the Building Site Boundary. The DRB's consent may include but is not limited to, the expansion or relocation of a Building Site Boundary. Building Site Boundary Relocations requests regarding the*

*following will require extra scrutiny: (A.) a relocation which would encroach San Miguel County's 100' Wetland Buffer Zone as identified as Lots 15, 23, 28, 48,* **50, 51,** *and 52 in Filing 1, Lots 85, 86, 91 and 99 in Filing 2, and Lot 45 in Filing 3; (B.) Lots which have been designated in the P.U.D. in paragraphs 11.1.7 and 11.2 by the Colorado Department of Wildlife which may encroach on wildlife habitat patterns, would require approval from CDOW and San Miguel County, those being Lots 30, 31, 35, 36 and 37 in Filing 1, Lots 119, 120, 121, Lots 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 161, 162, 163 and 164 in Filing 2 and Lots 108, 109, 110, 111, 112, 113, 153 and 154 in Filing 3. Nothing in this paragraph shall be construed to authorize the construction of any Improvement, including but not limited to excavations, buildings or landscaping within a Building Site Boundary without the prior written approval of the DRB pursuant to the Design Regulations."*

**8.12.2. Building Site Boundary Goals, Objectives and Purposes.** The purposes of the Building Site Boundary include the following goals and objectives: (a) **to maintain privacy in the Community, (b) to reduce uncertainty of neighbors as to which view corridors might be impacted in the future by construction**, (c) to help insure that structures blend with the surrounding landscape and topographical features rather than being a dominating feature of the neighborhood, (d) to protect natural vegetation, whenever possible.

**8.12.3. Procedural Requirements for Building Site Enlargement or Relocation.** Consistent with the Building Site Boundary Covenant, the DRB may consider a request by an Applicant to either enlarge a Building Site Boundary ("**Building Site Enlargement**") or relocate a Building Site Boundary on the Applicant's Lot ("**Building Site Relocation**"). When considering an Application for either a Building Site Enlargement or a Building Site Relocation, the requesting Applicant and the DRB **shall follow and apply** the following procedural steps:

A.      An Applicant must submit an Application for the Building Site Enlargement or Building Site Relocation with its Sketch Plan Review Application, which Application will be considered and acted upon by the DRB as part of its consideration and action on the Sketch Plan Review Application. This will allow the DRB to evaluate the impacts of proposed Improvements in the area of the Building Site Enlargement or the Building Site Relocation.

B.      With respect to the consideration and evaluation of an Improvement as contemplated by the Building Site Boundary

Covenant and evaluated pursuant to these Design Regulations, the following Improvements may be placed outside of the Building Site Boundary: landscape elements (including landscaping, fountains, statues and other features), fences, patios, walkways, driveways and limited parking areas, retaining walls (not exceeding 2 feet in height).

C.      Prior to submitting an Application for a Building Site Enlargement or Building Site Relocation, the Applicant shall send correspondence to the owners of Lots in the Community which are located within 500 feet of the Lot boundary, advising of the intention to submit an Application for a Building Site Enlargement or Building Site Relocation. The correspondence shall identify the name and contact information for the Applicant and representatives of the Applicant and shall include a copy of the Building Site Enlargement or Relocation Submission Materials that are being submitted to the Homeowners Company. The Applicant shall make reasonable efforts to discuss the Building Site Enlargement or Building Site Relocation with the neighbors. Copies of the communications from the Applicant to neighbors and any responses from the neighbors shall be included in the Application submitted to the DRB.

D.      When submitting an Application for either a Building Site Enlargement or a Building Site Relocation, **the burden of proof shall lie with the Applicant to demonstrate to the DRB that the Application should be granted. Generally speaking, the existing Building Site Location should be the presumed location for the siting of the Residence and Improvements, and there is no presumption in these Design Regulations and Governing Documents that a Building Site Enlargement or Building Site Relocation must be approved by the DRB. Each proposal for a Building Site Enlargement or a Building Site Relocation shall stand on its own unique facts and circumstances**, and shall not constitute a binding precedent on any subsequent action taken by the DRB on other applications for a Building Site Enlargement or a Building Site Relocation. **Each Application for a Building Site Enlargement or a Building Site Relocation submitted to and reviewed by the DRB shall be evaluated and considered on its own merits.**

E.      As part of the Site Visual Aids for the Residence and Improvements being considered by the DRB during the Sketch Plan Review Process, the Applicant shall cause the Lot to be likewise

staked to show the area of the existing Building Site, the area of the proposed Building Site Enlargement or a Building Site Relocation, the proposed corners of the Residence, and story poles demonstrating the main ridge height and highest point on each structure. The DRB Chair may direct that additional information be demonstrated by the Site Visual Aids.

**8.12.4. Submission Requirements**. The Application for the Building Site Enlargement or Building Site Relocation shall, at a minimum, include the following:

A.      A site plan showing the existing Building Site and the proposed location of the Building Site Enlargement or Building Site Relocation. The direction and distance of the Building Site Enlargement or Building Site Relocation should be clearly shown on the site plan and tie into the point indicated for the Lot in the Building Site Covenant.

B.      The Sketch Plan Review Application must include a drawing showing the proposed Improvements to be placed in the area of the proposed Building Site Enlargement or Building Site Relocation, including driveway and monument signs.

C.      A drawing illustrating the visual impacts to the adjacent Lots to whom mailed notice is required to be sent. The plans/drawings shall be prepared both in plain view and as a cross-section and accurately show siting and height of the proposed residential structure being pursued by the Applicant, as indicated in its Sketch Plan Review application when viewed from an existing home on the adjacent Lot or the center of the platted Building Site location (if a home has not yet been constructed). The Applicant shall prepare a similar drawing showing the same visual impacts to adjacent Lots had the Applicant constructed the proposed residential structure within the area of the original platted Building Site location. The drawings should incorporate topography and contours.

D.      The site plan shall identify clearing, grading **and trees that would be removed if the proposed Improvements are allowed to be constructed within the requested Building Site Enlargement or Building Site Relocation, and the comparative clearing, grading and tree removal that would be required if the development would occur within the area of the original platted Building Site location.**

E.      **A narrative describing in detail the grounds and rationale for the requested action and an analysis concerning how and why the request complies with the Design Regulations, specifically all review standards under this Section concerning the goals and objectives for a Building Site Enlargement or Relocation and the criteria to be considered when evaluating such an Application.**

**8.12.5. Review Standards.**

A.      In reviewing an Application for a Building Site Enlargement or a Building Site Relocation, the DRB, in its sole discretion, shall consider and balance the review criteria and standards stated below and such other factors and elements that the DRB determines to be relevant.

(i)      **The reason(s), factors, conditions and circumstances for the requested Building Site Enlargement or Building Site Relocation, which are unusual for the Community and will materially impact the ability of the Applicant to reasonably develop the Lot.** The reason(s), factors, conditions and circumstances may include, without limitation: site conditions, e.g. soils and other geotechnical conditions, geologic hazard conditions, groundwater, wetlands, rocks, topography, access, utility locations, home design and other relevant factors and considerations, as detailed in reports/studies prepared by qualified consultants retained by the Applicant.

(ii)      The movement of the Building Site must be the minimal distance of the relocation required by the Applicant to overcome or resolve the stated site condition(s). **The movement of the Building Site should not be used solely by the Applicant as a means to improve views or other similar factors for the Lot,** and such grounds alone shall not be the basis for the DRB to approve an Application for a Building Site Enlargement or a Building Site Relocation, unless approved by each of the adjacent Owners.

(iii)      When considering the movement of a Building Site, the Applicant and DRB **shall pay special attention to and carefully scrutinize impacts from movements involving Lots experiencing wetlands, wetland buffer areas,** Height Limitation Lots, Turn Out Lots, and wildlife habitat areas noted in the County Approvals.

(iv)   When considering the movement of a Building Site, the Applicant and DRB shall pay special attention to and carefully scrutinize **prior modifications and changes to the Building Sites on neighboring lots**, or common open space, if any.

(v)   The DRB will consider and scrutinize the type, nature, extent and degree of the resulting impacts of the proposed Building Site Enlargement or Building Site Relocation **to the neighboring properties** as well as to common open space in terms of materially increased visibility, noise and similar influences.

B.   In considering **this balancing test,** the DRB shall be mindful of the degree of the proposed movement of the Building Site and any comments and concerns expressed by the Owner of a neighboring Lot, **with the understanding that the greater the movement of the Building Site closer to a neighboring Lot and/or to a higher point or a lower point on the Lot, the greater the resulting potential impact. The DRB shall consider prior modifications and relocations to the Building Site on neighboring Lots.** Therefore, the DRB shall endeavor to **minimize the movement of the Building Site to the minimal distance needed by the Applicant to mitigate the site conditions** that generated the need for the proposed Building Site Enlargement or Building Site Relocation. The goal of the DRB shall be to balance impacts of the proposed construction of a Residence, should a proposed Building Site Enlargement or a Building Site Relocation on the Lot be approved, to existing view corridors from Improvements on neighboring Lots or common open space parcels, with the goal being that the proposed structures do not unreasonably impact scenic views.

C.   When acting on a Building Site Enlargement or a Building Site Relocation Application, the DRB **shall act reasonably and cautiously.**

**8.12.6. <u>Further Requirements.</u>**

A.   In acting upon a request for proposed Building Site Enlargement or Building Site Relocation, the DRB may impose requirements on the Applicant which may include, without limitation, modifications to the mass/scale/height or placement of the proposed Residence and other Improvements on the Lot,

enhanced visual impact mitigation (berming/landscaping) and other factors to reduce impacts.

B.      When acting on an Application for either a Building Site Enlargement or a Building Site Relocation, the action shall be specifically tied to the Residences and Improvements presented to and approved by the DRB in the Sketch Plan Review Application and the Final Plan Review Application. If the Applicant seeks to pursue any Material Plan Changes to a Sketch Plan or Final Plan as provided for in Section 8.11.1 that were approved by the DRB in connection with a Building Site Enlargement or a Building Site Relocation and related Sketch Plan Review Application and/or the Final Plan Review Application, the Applicant shall submit an Application to amend the Building Site Enlargement or a Building Site Relocation along with the Sketch Plan Review Application and/or Final Design Plan approvals, which shall be reviewed by the DRB in the same manner and process that was used to originally approve the Application and shall be considered pursuant to the applicable standards and provisions of the Design Regulations and Governing Documents for both design review of the structures and factors used for reviewing Application for a Building Site Enlargement or Building Site Relocation.

C.      If the Building Site Enlargement or a Building Site Relocation is approved by the DRB, the Homeowners Company shall prepare a revised Building Site Boundary Covenant reflecting the Building Site Enlargement or a Building Site Relocation ("Building Site Boundary Covenant Amendment"), which shall be executed by the Homeowners Company Board, the DRB and the Applicant within 30 days of the approved Final Design Review Plan, and in any event, prior to the commencement of any site disturbance activities on the Lot.

D.      **Any DRB approval of a Building Site Enlargement or a Building Site Relocation shall be contingent on the Applicant constructing only the Residence and other Improvements reflected in the approved Final Design Review Plan and construction commencing within one year of the DRB's final action on a Final Design Review Plan,** unless the DRB, in its discretion, grants an extension for good cause shown by the Applicant.

E.      **If construction of the approved Improvements has not commenced within one year of the DRB's final action on**

**a Final Design Review Plan, or such later date that the DRB has granted an extension, the approval of a Building Site Enlargement or a Building Site Relocation shall automatically expire and become null and void.** Thereafter, the Homeowners Company is authorized and directed, without the consent of the Owner of the Lot, to record a Termination Notice which will publish notice that: (i) the Building Site Enlargement or a Building Site Relocation has been rescinded, (ii) the prior, original Building Site Boundary as established in the Building Site Covenant will thereupon apply to the particular Lot and (iii) any reference to the Building Site Boundary Covenant Amendment and/or the Building Site Enlargement or a Building Site Relocation is extinguished of record. Prior to recording the Termination Notice, the Homeowners Company Staff shall send a courtesy notice of its intention to record the notice, which shall be sent one week in advance of the intended recordation date.

**B.      Applicable Limited Waiver Process**

41.      The relevant provisions of the Governing Documents as to Limited Waivers provide:

**8.17      Requests for Limited Waiver. [5]**

8.17.1 Requests for and consideration of a Limited Waiver shall be handled as provided for in the Governing Documents and these Design Regulations.

8.17.2 The types of design and development elements for which an Application for a Limited Waiver may be considered by the DRB includes, without limitation, matters such as window size, exterior material, roof materials, roof pitches, allowance of a detached accessory structure, payment of fees and other matters or requests noted in the Design Regulations, or matters that the DRB Chair determines to be appropriate for consideration by the DRB.

8.17.3 A request for a Limited Waiver will be considered by the DRB in the context of the Sketch Plan review and again, as part of a Final Plan review. The Limited Waiver request must be submitted as a

---

[5] Since the matters at hand, ARHOC Governing Documents (Fourth Amended DRB Regulations) state: "Only two (2) Limited Waivers will be considered on any Application or Lot." Additionally, the fee for each requested Limited Waiver Request has increased from $500 to $10,000.

separate document with the Application for Sketch Plan review and the Final Plan review. The request for a Limited Waiver must be clearly titled as a Request for a Limited Waiver, **cite the provision for which the Limited Waiver is sought and clearly state the reasons for the request.** The DRB may approve a request for a Limited Waiver if the DRB, in its sole discretion, determines that the request does not materially deviate from the design goals and objectives of the Design Regulations and does not materially cause increased visual impacts on neighboring Lots or the Community and meets other criteria provided for in the Design Regulations which relate to the particular Limited Waiver.

## VIII.
## FACTS GIVING RISE TO THIS COMPLAINT

### A.    Brief Background

42.    In December of 2016, Das purchased Lot 50 with an existing house in Aldasoro Ranch for nearly $3,000,000. The adjoining Lot 51 had a current designated building site/circle which was relied upon in making a decision to purchase Lot 50 and the existing home. The building site on Lot 51 was represented by the realtor (the chair of the DRB – Jake McTigue) to be the "existing" and "designated" building site. No disclosure or even the existence of a BSR process was ever disclosed by the realtor or the ARHOC to Das prior to purchase. No closing documents were required to be signed or acknowledged by Das of the ARHOC's Governing Documents (save and except with regard to dog ownership), let alone a process or the ability to move an existing and designated building site or obtain waivers of building regulations. Both Lots 50 and 51 are also separated by San Miguel County's 100' Wetland Buffer Zone.

43.    Lot 51 – the property adjoining Ads' property (Lot 50) – has been on the market for many years. Many individuals, including current Owners, considered the purchase and/or the likelihood of construction on Lot 51 in the designated building circle. However, all were advised that any potential construction of a home on the existing building site would have to be of a "small

scale," "difficult," "expensive," and require significant additional funds. Knowing the restrictions in place, the previous litigation involving other proposed building site relocations, the required burden of proof for a building site relocation and the requirements in place to build on the existing building site location on Lot 51, Brand Investments, LLC ("Brand") (owned and/or managed, in part, by a local realtor/broker with Telluride Properties) purchased Lot 51 at a substantial discount and well below previous asking prices. The purchase by Brand of Lot 51 occurred in approximately January of 2018 at the steeply discounted price of $475,000 compared with previous asking prices as high as $885,000 – i.e., 53% of the asking price. That is, the real estate market accounted for the far from ideal conditions of Lot 51: the inherent limitations for this parcel of land were factored into, or "baked in," the purchase price.

44.    Prior to the purchase of Lot 51, Brand performed due diligence including a Geotechnical Engineering Study. The Trautner*GeoTech [November 24, 2017] Lot 51 Geotechnical Engineering Study states in relevant part:

1.1    Scope of Project

The basic level slope stability modeling provided in this report should be considered as feasibility level modeling.

The development of the project may require **specialty shoring design and construction, including the use of soil nail and reinforced shotcrete and/or micropile shoring features**. . . . A specialty shoring design engineer will be needed for the design of these types of structures

5.0 BASIC/FEASIBILITY LEVEL SLOPE STABILITY ANALYSES
. . .
We did not model soil nail components in the slope stability analyses presented above as theoretical factor of safeties greater than 1.5 were obtained in our basic/preliminary models. However, **we anticipate that specialized shoring will be needed to stabilize some of the project short term and long-term excavations. We recommend that the project**

owner have an allowance in the construction budget for specialized shoring such as the use of soil nails and shotcrete structures.

. . .

In general, the need for specialized types of shoring structures can be reduced or minimized by designing the structure in order to limit the vertical extent of excavation cut slopes/retaining features. . . . .

In general we feel that placement of the structure within the existing designated envelope for the lot will help minimize the need for specialized shoring features. This is due to the fact that slightly flatter topography exists within the designated building envelope.

. . .

12.0 CONCLUSIONS AND CONSIDERATIONS
We feel that it is feasible to develop this site for the proposed residential user. . . .

Relevant Portions Trautner*GeoTech [November 24, 2017] Lot 51 Geotechnical Engineering Study ("engineering study").

45.     With full knowledge of the engineering challenges and best placement of the structure with regard to minimizing specialized shoring needs (within the existing designated envelope), Brand purchased Lot 51 and went on to design a home that specifically did not address the conclusions of the engineering study. Albeit at half the asking price.

46.     Subsequently, and without knowledge of or agreement/consent from Das (Lot 50), and with knowledge that several of the DRB Members, including Wright (see below) and Jeff Koening and Craig Spring had each obtained building site relocations and/or enlargements on their Lots, Brand – contrary to its own engineering study – proceeded to engage a design/builder (Rich Ciechiuch) to design a substantially prefabricated home with no intent or regard for the Existing Building Site or design regulations.

47.     Furthermore, Brand's designed home was not in compliance with DRB Regulations, included more than a dozen Limited Waivers, including roof slope and pitch,

resulting in a massive structure. In fact, the chosen massive scale and design, which was never questioned by Defendants became a basis to argue for a BSR and Limited Waivers during the process.

48.     Instead of following Governing Documents and based a host of factors, including that Das was not a "local" but instead from Houston, Texas; retention of DRB Member Wright's Architecture Firm – One Architects – with respect to design and location of a potential home on Lot 51; knowledge that Wright would refuse to recuse herself; and knowledge of the bias of the Defendants (specifically DRB Members) with respect to a BSR, Brand decided it would be able to obtain a unjustified and unwarranted BSR and Limited Waivers.

49.     In summary, Brand while able to do so and supported by its own engineering study, never designed a home nor intended to build in the Existing Building Site or in compliance with DRB Regulations.

## B.     BSR/Limited Waivers

50.     On September 24, 2019 (after a process that started in February of 2019),  the subject DRB consisting of Jodie Wright, Craig Spring and Jeff Koenig (each who had obtained their own BSR's) approved Brand's (Lot 51) BSR and numerous Limited Waivers. Jake McTigue, the current Chair of the DRB, recused himself because of his involvement as the broker for Das with respect to the purchase of Lot 50 and the existing home. Wright, despite a motion and request for recusal, chose not to recuse herself and the recusal matter was never considered by the DRB or BOD.

51.     The corresponding minutes of the September 24, 2019, DRB meeting were not approved until December 18, 2019. Subsequently, Final Plan Conditions for Lot 51 (incorporating

applications for Building Site Relocation and Sketch Plan Review) were adopted by the DRB on January 14, 2020.

52.     The September 24, 2019, DRB Minutes approving the BSR cite the following Findings as justifications for Lot 51's BSR Application:

- The Building Site Relocation is justified by certain factors, conditions, and circumstances that are unusual for the community and materially impact the ability of the Property owner to develop Lot 51 as stated in the three public meetings and evidence and testimony provided by the Applicant including without limitation steep slopes and soil conditions that include expansive soils, and subsurface water conditions that make **developing the Existing Building Site more risky than the Proposed Building Site.**

- The movement of the Proposed Building Site is the minimal needed to overcome the stated factors, conditions, and circumstances that are unusual for the community and materially impact the ability of the Property owner to develop Lot 51.

- The Applicant has designed the home to minimize impacts to surrounding property **owners** through extensive landscaping, sensitive siting design, thoughtful placement of outdoor spaces and building design that focuses on privacy and minimizing impacts.[6]

- The Applicant has significantly compromised the Building Site Relocation by significantly reducing the relocation to the minimum necessary **as a balance between creating a better building site and maintaining the privacy of adjacent property owners**.

53.     The DRB Minutes of September 24, 2019, with respect to BSR and the full record of Brand's Applications for BSR and Sketch Plan Review were also adopted and incorporated in the Final Plan Conditions for Lot 51 by the DRB on January 14, 2020.

_____

[6] This finding is also significant with respect to Das' damages claims. As incorporated, the DRB acknowledged that the BSR of Lot 51 negatively impacts Lot 50, thereby confirming a taking, injury and detriment to Lot 50 and the existing home.

Das Complaint.docx
2402908.1

54.     The granting of the BSR and Limited Waivers were in violation of Governing Documents, contrary to supporting evidence, and while not required for purposes of the claims and relief sought herein were arbitrary and/or capricious, and the conduct and acts of the BOD Defendants and DRB Defendant were wanton and willful.

**C.     Soils and Subsurface Water**

55.     While previously requested by the DRB during a hearing and made part of the DRB Minutes (DRB Minutes of May 29, 2019 - approved June 11, 2019) and part of required DRB Regulations for a BSR, a slope stability analysis for the Proposed New Building Site was never presented.

56.     In violation of Governing Documents and consistent with improper conduct of the DRB and, after requiring a slope stability analysis (confirmed in DRB Minutes) for the Proposed New Building Site and without being provided one by Brand, the DRB nevertheless went forward with granting Brand's BSR. The apparent reason why Brand refused to provide the slope stability analysis on the Proposed New Building Site: the soils and subsurface water conditions between the two (2) sites are the same, if not worse, on the Proposed New Building Site.

57.     Following the DRB's approval of Brand's BSR on September 24, 2019, Lot 51 submitted an additional letter from Trautner*GeoTech dated September 19, 2019, that was referenced during the September 24, 2019, DRB hearing. The existence of the supplemental engineering study was disclosed by Jonathan Butler, P.E. during questioning at the DRB hearing by Das. Brand had <u>not</u> previously disclosed the existence of the supplemental engineering study. The Letter, titled: Additional Slope Stability Analyses and General Comments/Recommendations

Lot 51 Aldasoro Ranch, Current Structure Location Option ("supplemental engineering study")

states in relevant part:

- Our geotechnical engineering recommendations for the structure foundation system and cursory/feasibility **slope stability for the project are presented in our November 24, 2017 report.**

.. . . .

- This letter provides additional slope stability analyses based on the current proposed structure location. . . . . This letter provides analyses that are local to the current proposed structure location.

. . . .

- **It should be noted that we do not have subsurface information within the area of the new proposed structure location.**

. . .

- As discussed in more detail below, **we do not know the potential subsurface water conditions** that may be present below the current proposed structure location. . . . . Additional field study would help determine if additional measures need to be taken for the project design and construction such as potential subsurface water conditions and possible slope stability considerations that may arise or become apparent during the construction of the project.

. . .

- As discussed above, **we are not aware of the subsurface water conditions below the current structure location**. . . . In addition, it is likely that at least seasonal subsurface water conditions will be located within the extents of the structure excavation.

58.     Despite this information, the DRB granted the BSR based on the current

engineering studies. Despite the original engineering study, which confirmed the subsurface

conditions (both soil and water) on the Existing Building Site allowed for a safe building site that

"is feasible to develop . . . for . . . proposed residential use."  and a supplemental engineering study,

which stated the soil conditions and subsurface water conditions on the Proposed New Site are the

same as, if not worse than, the Existing Building Site, the DRB (contrary to Governing Documents

and the BSR requirements) approved a Final Sketch Plan and BSR Application on January 14, 2020, citing soil conditions and subsurface water as justification. [7]

59.     During the July 9, 2019, DRB hearing, the following statements were made by DRB Members and the Lot 51:

- Jodie Wright's quotes from July 9, 2019, DRB meeting:
  o   I do think there is a lot of focus on the actual stability of that slope **and we all know that you can build on steep slopes** to that end.
  o   How steep is -- **steeper is more money**. That's my experience and that's relative here as well.

- Rich Cieciuch's quote from July 9, 2019, DRB meeting:
  o   You got 2 sites that essentially are equally stable.

- Jessie DiFiore's (principal and/or manager of Brand) quote from July 9, 2019, DRB meeting:
  o   We never said the slope was not stable.

- **Jennifer DiFiore's (principal of Brand) quote from July 9, 2019, DRB meeting:**
  o   **We got a slope [stability study] - we did do this before we bought the property because this lot has been on the market for about 15 years because where the building circle stands, no one is willing to buy it and build on it. So unless the HOA wants to deem it unbuildable and buy it back as open space, they should never have sold the lot.**

60.     Additionally, the DRB Consultant, Chris Hawkins, stated in his 05/03/2019 Memo: The Trautner*GeoTech letters and report **do not identify** any topographical or soils conditions that would preclude the development of the Existing Building Site. *See* page 7, Chris Hawkins Memo of 05/03/2019. Despite these statements and confirmation by the DRB's own consultant, it

_____

[7] Despite knowledge that Brand had performed subsequent slope analysis and inquiry as to subsurface water conditions on the new proposed site, neither the DRB or BOD required the production of the same prior to granting and approving Brand's BSR.

issued Findings that the BSR was based on "steep slopes and soil conditions that include expansive

soils, and subsurface water conditions that make developing the existing Building Site 'more risky'

than the Proposed Building Site."

61.     Of importance, the review standards for a BSR in the DRB Regulations do not

mention "slopes" as a factor nor do they mention "risk." In a subdivision such as Aldasoro Ranch,

which has Lots on a side of a mountain (ranging in elevations from 9,000- 10,000 feet), it is

unreasonable to justify a BSR for a steep slope or increased risk, which was known to Brand before

purchasing Lot 51.

62.     With respect to factors, conditions, and circumstances that are unusual for the

community and materially impact the ability of the property owner to develop Lot 51, there is no

evidence that the Existing Building Site on Lot 51 has any and Brand failed to provide any such

factors, conditions and circumstances. The DRB Findings and justifications of steep slopes and

soil conditions that include expansive soils, and subsurface water conditions that are unusual for

the community AND materially impact the development do NOT exist. Additionally, Chris

Hawkins' Memo of 05/03/2019 is also worthy of reference.

- Chris Hawkins' 05/03/2019 Memo: (1): access to the Existing Building Site are feasible without retaining features and without a significant increase in site grading in comparison to the proposed building site. (2) It is not unusual to have long driveways and retaining walls in Aldasoro Ranch development. (3) **Staff is not sure if reducing driveway costs falls within the envisioned BSR criteria since it has to materially impact the ability of an owner to develop a property. Cost alone should not be the sole determination in the opinion of staff.**

63.     While Brand's approved BSR  per the BOD's Final Decision (see below), is for 22

feet both west and south  toward the existing home of Das (Lot 50) (approximately 36% reduction

with the auto-court in the current distance between Lots 50 and 51), no DRB Regulation allows a BSR to "create a better building site." This finding and justification (#9) by the DRB by way of its September 24, 2019 Minutes is contrary to DRB Regulations. Instead, the DRB Regulations state in relevant part: "The movement of the Building Site must be the minimal distance of the relocation required by the Brand to overcome or resolve the stated site condition(s)."  DRB Regulation Section 8.12.5, subpart (ii).

64.     Since no stated site conditions exist and all existing site conditions were known by Brand before purchasing Lot 51, there is no reason or justification for Brand's BSR. Additionally, no evidence has been provided that supports such a Finding. On the contrary, the evidence even of the DRB's own consultant, weighs heavily against such a Finding and the granting of the BSR was in contravention and breach of Governing Documents.

65.     Additionally, while required by Governing Documents, the DRB did not understand, much less require Brand to meet its burden of proof for a BSR.

**D.     Wetland Buffer**

66.     DRB Regulation Section 8.12.5 **Review Standards** states:

> A.     . . .
>
> (iii)    When considering the movement of a Building Site, the Applicant [Brand] and DRB shall pay special attention to and carefully scrutinize impacts from movements involving Lots experiencing wetlands, wetland buffer areas, Height Limitation Lots, Turn Out Lots, and wildlife habitat areas noted in the County Approvals.

67.     Lots 50 and 51 are wetland buffer lots, therefore any BSR request required the DRB's extra scrutiny. The BSR Application approved by the DRB results in a reduction of the wetland buffer between Lots 50 and 51 by approximately 33.33%. The existing building site setback is approximately 60 feet and the proposed BSR reduces it to approximately 40 feet.

- The county required wetland setback is 100 feet.

- Jeff Koenig's [DRB Member] quotes from July 9, 2019 DRB meeting:

  One of my big concerns is protecting this wetland buffer. [We need to be] getting the house out of the wetland buffer . . .

68.     With respect to the BSR, once again the DRB's own consultant Chris Hawkins stated: "The biggest change is a reduction in the wetland buffer with the Existing Building Site setback at approximately 60 feet and the Proposed Building Site at approximately 40 feet." Chris Hawkins' Memo of September 19, 2019.

69.     Despite this restriction, the DRB made no mention or inquiry as to impacts to the further reduction of the wetlands or wetland buffer areas. In fact, other than an unsupported Finding referencing "extra scrutiny" (DRB Minutes Finding #4,) no evidence of any nature is in the record with respect to evaluating the impact on the wildlife or to explain any justification for further impact into the wetland buffer. Contrary to its own regulations, the DRB completely ignored the wetland buffer criterion in reaching its decision.

**E.     Owner of Lot 50 – Denied BSR**

70.     DRB Regulation Section 8.12.5 **Review Standards** states:

  A.     . . .

              (iv)     When considering the movement of a Building Site, the Applicant and DRB shall pay special attention to and carefully scrutinize prior modifications and changes to the Building Sites on neighboring lots, or common open space, if any.

71.     The previous owner of Lot 50 sought a BSR (both relocation and enlargement). However, Lot 50's previous owner was denied both due to, in part, because the request would encroach on the San Miguel County's 100-foot Westland Buffer Zone as identified with respect to

Lot 50. Nothing has changed that would now allow Lot 51's intrusion into the same wetland buffer that Lot 50 was prohibited from previously invading.

72.     While a required consideration and previously mentioned by Das (September 22, 2019 Objections and Comments), no mention is made by the DRB in any of its minutes or findings as to this critical factor. The reason appears to be due in large part to the lack of consideration or review by the DRB of presented evidence by Das. The conduct of this DRB and its willful and wanton conduct is best summarized by the following statement by DRB Member Jodie Wright at the July 9, 2019, DRB meeting, in which she made clear that she had <u>never</u> read Das' September 22, 2019, Objections and Comments:

| Jodie Wright | I have a question for staff – I understand that Lot 48 [Harvey Roisman] is who you are representing in your request for additional stability information. But has Micky Das [representative of Lot 50] sent anything in on this? |
| Pam Bennett | Yeah, he's sent in a 6 page letter just the other day, it's on the website, and it's basically asking for a stability study as well. |

73.     Throughout the course of the DRB meetings, while Brand was given unlimited time to present its Applications, call experts (without notice or subject to adequate inquiry or exam by Das), Das and Lot 48 (also objecting to the BSR and Limited Waiver Requests of Lot 51) were continually restricted as to time. And every DRB meeting with respect to Public Comment (which Das was placed into) was preceded by an inquiry and admonition by DRB Member (acting chair)-Jeff Koenig with "How much time do you need . . ." and basically why.

F.      **Structures Outside Building Site Boundary**

74.     DRB Regulation Section 6 SITE PLANNING states in relevant part:

> 6.1     **Building Site Boundaries.** A Residence, Accessory Structure (if any), Accessory Housing Unit (if any), enclosed parking structure, storage facility and any landscape elements must be built entirely within the recorded designated Building Site Boundary for such Lot, except that limited disturbances are allowed outside of the Building Site Boundary for driveways/entry features, underground utilities, landscaping and limited clearing and grading; and further except for other limited circumstances under which a Building Site Relocation or Enlargement Applications for Building Site Relocation or Enlargement shall be reviewed and acted upon by the DRB, pursuant to the procedures set forth in the Governing Documents and these Design Regulations.

75.     The First Amendment to the Aldasoro Ranch Building Site Boundary Covenants recorded in San Miguel County's property records at Reception Number 313784 ("Building Site Covenant") states that:

> Improvements, including but not limited to excavations, buildings, decks, patios, roof overhangs, play areas, swimming pools, tennis courts, and enclosed parking areas may not be located or constructed on the lot outside of the corresponding Building Site Boundary. The Design Review Board in its sole discretion, may grant exception to this covenant; however, the DRB shall exercise its discretion cautiously. It is anticipated that **only driveways, underground utilities, limited surface parking and landscaping** will be allowed outside of the Building Site Boundary.

76.     Despite this limitation and without any justification or support, the DRB granted further waivers and exceptions to DRB Regulations for Brand with respect to:

> 1.      A large auto court that also functions as the fire truck turnaround;
> 2.      One of the required parking spaces;
> 3.      Retaining walls;
> 4.      Drainage and grading; and
> 5.      An in-ground trampoline.

77.     Brand's waivers and exceptions for an auto court, parking spaces and retaining walls on the west side toward Das' Lot 50 is a direct result of the BSR and in effect a back door

attempt to obtain an additional building site enlargement to avoid the required access to the Existing Building Site. The granting of the same are substantial, cause further impact to Lot 50 and also encroach into the wetland buffer.

- Jeff Koenig's quote from July 9, 2019 DRB meeting:
  I think . . . getting that [motor court] as far east as possible to protect the wetland buffer and all of those things [is necessary].

## G.   Twelve (12) Limited Waivers

78.     By way of the Final Plan Conditions and with respect to Limited Waiver Requests for Lot 51, the DRB once again without justification, and contrary to the DRB Regulations as to design and theme, granted the Brand's 12 Limited Waiver Requests. *See* Final Plan Conditions Lot 51 of January 14, 2020.[8]  Despite their name, Brand's waivers are far from "limited" - both in number and in scope.

79.     The current DRB Regulations have no required criteria for the DRB Members to utilize or to restrain them with respect to limited waivers. As a result, the DRB members in the instant matter granted excessive waivers, twelve (12) to be exact, that further resulted in a massive and obtrusive structure being approved in close proximity to Lot 50, owned by Das. DRB Consultant Chris Hawkins' Memo of January 10, 2020, states in relevant part:

80.     Brand is seeking the following 12 limited waivers of the noted Design Regulation sections:

> Roof slopes that are less than 3:12 (Section 5.3.1)
> New roofing material (Section 5.3.5)
> 8 windows and doors larger than 30 sq. ft. (Section 5.6.2)
> Detached Accessory Structure (Section 6.10)
> Driveway grades in excess of 10% (Section 6.6)

---

[8] Based on available information and review of ARHOC records, Appellant has been unable to find any other application where a DRB granted 12 Limited Waivers to an Owner.

*See* Hawkins' Memo of January 10, 2020.

81.     DRB Regulation Section 8.17. **<u>Requests for Limited Waiver</u>**, Subpart 3 states in relevant part:

> . . . The DRB may approve a request for a Limited Waiver if the DRB, in its sole discretion, **determines that the request does not materially deviate from the design goals and objectives of the Design Regulations and does not materially cause increased visual impacts on neighboring Lots** or the Community and meets other criteria provided for in the Design Regulations which relate to the particular Limited Waiver.

82.     Despite that unequivocal language, the Limited Waivers here "materially deviate from the design goals and objectives" and "materially cause visual impacts" to neighbors. The subject DRB, without findings or justification and in an arbitrary and capricious manner, approved twelve (12) Limited Waivers. While the DRB is charged with defending and enforcing the Design Regulations and considering the "increased visual impacts on neighboring Lots or the Community." The subject DRB (guided by Defendant Wright) failed in its gatekeeper function, necessitating an Appeal to the BOD under the Governing Documents to step in and comply with the ARHOC and DRB regulations set forth in its own governance documents.

83.     Some of the limited waivers are further discussed below.

**H.     Roof Slopes That Are Less Than 3:12**

84.     Section 5.3.1 of the Design Regulations states:

> 5.3.1 Roof forms shall be kept simple and reflect the topography of the underlying site and its proposed landscaping. To the extent possible, roof lines shall be nestled into the landscape. Gable, hip and shed roofs may be used. **No elements of the roof may be less than 3:12.** Dormers are encouraged both to break up long expansive roof lines and to make habitable spaces within the roofs. Dormers may have gable, hip or shed forms.

85. Chris Hawkins' January 10, 2020 Memo confirms that Brand's structure does not meet the instant DRB Regulation:

> The west and east elevations on Sheet A302 and A305 have what appear to be intersected shed roof forms and a slight gable form with 1:12 slopes. The southwest quadrant of the proposed roof where the solar panels are located has slopes of 1:12 leading to a nearly flat roof form of ¼:12. A small deck on the north side of the home with a flat roof is proposed over living space.

**I.  Building Height**

86. The proposed home for Brand is at the maximum visible height of 35 feet.

87. Design Regulation Section 5.1.3 **Maximum Visible Height.** states:

> No Improvements on Lots . . . shall exceed 35 feet in absolute height from the lowest visible point of a structure to the highest visible point of a structure . . .

**J.  Building Scale**

88. However, as a result of the granting by the DRB to Brand of these Limited Waivers as to roof forms and slope, the structure will be greater in mass thus further impacting Das' Lot 50.

89. Design Regulation Section 2.7.3 **Building Scale**. states:

> Smaller homes in line with the applicable bulk/mass and scale provisions of the County Land Use Code are encouraged. Architectural massing of proposed structures should seek to minimize their apparent size and impact.

90. Once again, the granting and approval by the DRB was without justification or reason and contrary to DRB Regulations and erode the Aldasoro Ranch design theme.

**K.    Eight (8) Windows and Doors Larger Than 30 sq. ft.**

91.    Design Regulation Section 2.7.2 **Protection of the Night Sky**. states:

Light pollution in the Community is a major concern and the balance between extensive daytime views and spilling of light at night must be addressed during the Design Review Process.

92.    Design Regulation Section 5.6.2 states:

Windows and doors should be simple in shape, arrangement and detail, and used in combinations to avoid large uninterrupted areas of glass. No uninterrupted area of glass shall exceed 30 square feet. Window openings and patterns should be responsive to energy efficient design principles, with appropriate wall-to-wall window ratios. Continuous, repetitive bands of windows shall be avoided.

93.    Per Hawkins' January 10, 2010 Memo:

The Sketch Plan Sheet A301 and A303 identifies eight (8) windows that are over 30 sq. ft. of glass area as follows:

South Elevation:        3 windows (62.2 sq.ft.; 2 at 42.4 sq.ft.)
North Elevation:        5 windows (2 at 45.6 sq.ft.; 1 at 94.4 sq.ft.)
                    Total:  8 windows

*See* Hawkins Memo of January 10, 2010. [Note, the Final Plan Condition states that 2 windows and 6 doors are larger than the 30 square foot limitation. This appears to be an error].

94.    Without justification or findings and in furtherance of DRB Member Jodi Wright's personal preference and stated opinion and open bias, these waivers were granted by the subject DRB.

**L.    Detached Accessory Structures**

95.    In addition and in further support of this DRB's arbitrary conduct with respect to the granting of the Limited Waivers, Das cites the DRB's conduct with respect to Brand's late request for an in-ground trampoline outside of the Building Site.

96.     Prior to the final DRB hearing, Hawkins' (DRB Consultant) issued a Memo of January 10, 2020, which stated:

> Staff would not recommend approving the in-ground trampoline outside the Building Site because it does not, in our opinion, meet the requirements of Section 6.1 of the Design Regulations or the associated Building Site.

> Staff has added a condition that requires the in-ground trampoline be relocated to be entirely within the Building Site prior to HOC staff issuing the Final Plan approval. (Condition #7).

97.     Despite the ARHOC Staff's recommendation, the subject DRB once again without justification or support granted a limited waiver to allow the in-ground trampoline outside of the building site. Said conduct, is demonstrative of the DRB's (including Wright's) improper and arbitrary conduct with respect to Brand's BSR and Limited Waiver Requests.

98.     On January 14, 2020, the DRB issued its Final Plan Approval (the "Record Date"), approving the requested BSR and twelve Limited Waivers, with conditions. The Final Plan Approval for Lot 51 is detailed in the Aldasoro Ranch Homeowners Company Design Review Board Minutes dated January 14, 2020.

99.     On January 17, 2020, pursuant to Governing Documents, Das submitted her Notice of Intent to Appeal.

100.    On March 4, 2020, the BOD - through its counsel - delivered a Notice of Appeal to the relevant parties apprising them of their individual rights to submit additional materials and noticing the March 24, 2020 date set for hearing on the appeal (the "Appeal Hearing"). Timely submissions of supplemental materials were received by the Board from Das on March 11, 2020. On March 17, 2020, Brand submitted a letter to the Aldasoro Ranch Company Manager- Pamela

Bennett, stating that Brand's earlier submissions during the DRB review process were sufficient and relinquishing their right to submit any addition or supplemental information.

101.    On April 23, 2020, without requesting any additional engineering studies and contrary to conditions and rationale utilized by the DRB and in violation of Governing Documents, BOD Defendants Holbrook, Jemison and Loesekan issued a "Final Decision – Lot 51 Building Site Relocation" ("Final Decision").

102.    In summary, the BOD approved the BSR and some of the Limited Waiver requests of Brand that had been granted by the DRB on January 14, 2019. Of mention, the Final Decision makes no reference to Das' request to recuse Defendant Wright and references reason(s), factors, conditions and circumstances that are NOT supported in the record, are not part of the DRB stated criteria for a BSR and Limited Waiver(s), are contrary to Governing Documents and are instead arbitrary and capricious, stating, *inter alia*,:

- The Board finds that the access which would be necessary to reach the designated building site on Lot 51 would materially impact the **Applicants' financial ability** to develop Lot 51. The Board further finds that the **additional time** that would be required to design and construct the access to the designated building site would materially impact the Applicants' ability to develop Lot 51 in a timely fashion. Finally, the Board cites to the Trautner Reports in finding that the installation of a 28-foot retaining wall allowing access to the designated building site on Lot 51 may result in a safety concern by affecting the stability of the soils underlying Lots 42 and 44.

- The Board finds that the proposed location of the BSR would make the Lot 51 residence less visible to the Aldasoro community.

- The Board finds the proposed Lot 51 BSR will have a positive impact on view corridors within the Aldasoro community. . .

- The Board finds that the proposed BSR will cause a disturbance to a wetlands buffer area but also finds that a disturbance to the buffer area is inevitable no matter the location of the building site on Lot 51.

103.     No mention is made by the BOD of any reduced privacy issues to Das' Lot 50. No mention is made as to the damages or injuries to Das in terms of diminution in property value to Das. No mention is made of the increased noise to Plaintiff.  No mention is made of the fact that Lot 50 (previous owner) was denied a BSR based on the Wetland Buffer. No mention is made of the loss of privacy (a protected right of Lot 50) as a result of the granted BSR and Limited Waivers.

104.     On August 12, 2020, purportedly in compliance with the BOD's Final Decision, Brand returned to the DRB with a Final Plan/Permit Submission. At this time Defendant Wright voluntarily recused herself from the proceedings, leaving only two (2) DRB Members - Jeff Koening and new DRB Member - Laurel Fredlake. Previous DRB Member, Craig Spring, after completing construction of his own home and after obtaining a requested building site enlargement, resigned from the DRB.

105.     Contrary to Governing Documents, the two (2) remaining DRB Members, on September 8, 2020, based on instruction as to  the existence of a quorum by the ARHOC Manager Pamela Bennett and proceeding with only two (2) DRB Members approved Brand's Final Plan (which included a BSR and certain Limited Waivers) with certain restrictions.

106.     Not happy with the restrictions, Brand went back to their supporter at the ARHOC – Pamela Bennett – who then decided on September 11, 2020 that the September 8, 2020 DRB proceeding on the matter should be vacated and reset for September 14, 2020 due to lack of a quorum. *See* September 8, 2020, DRB Minutes.

107.     In the interim, without proper notice and in contravention of Governing Documents and Colorado law, a former DRB Member, Craig Spring, was "appointed" by the BOD during a "special meeting" to hear the matter.

108.    Not surprisingly, on September 14, 2020, the DRB issued the following Minutes

(approved on October 13, 2020):

## ALDASORO RANCH HOMEOWNERS COMPANY
### DESIGN REVIEW BOARD MINUTES

Date of Meeting:        September 14, 2020

. . .

Welcome Craig Spring! Craig was appointed by the BOD by consent on
September 11, 2020 to participate as a regular DRB member for the Lot 51
Application so that a quorum can be established.

. . .

3.      Lot 51 Final Plan Conditions remanded back to the DRB for
        consideration
        Laurel made a motion to approve the Lot 51 Final Plan as presented
        with the following conditions:

        1.      Prior to HOC staff approving the final plans, the
        Applicant will remove the landscaping plan Sheet L2-02 that
        does not meet the HOC BSR Condition No. 2. All landscape
        protection fencing shall be reviewed and approved by the HOC
        staff prior to installing. Trees to be saved will be protected by
        HOC approved fencing.
        2.      Prior to HOC staff approving the final plans, the
        Applicant shall provide a new plan sheet that shows the tree
        survey on the grading plan to assist the HOC in understanding
        the number of trees proposed for removal. The Final Plan set
        will be revised to show all of the trees to be protected on Sheet
        L2-00.
        3.      Prior to HOC staff final inspections, the HOC staff will
        conduct a night time inspection with all interior lights on without
        any dimming to ensure no excessive exterior light spill that
        could be seen from a neighboring site or public way which is not
        permissible. The HOC may require additional shading to prevent
        lighting impacts from interior lights if the lights cannot be
        adjusted to prevent excessive light spill.
        4.      Compliance with these conditions will be initially
        reviewed by HOC staff and referred to the DRB Chair for final
        review and approval prior to the HOC staff issuing the final plan
        approval.
        5.      All the Board BSR Conditions and DRB Final Plan
        Review conditions (unless altered by the HOC Board decision)

Das Complaint.docx
2402908.1

shall be incorporated into and included in the final plan set that is stamped and signed by the HOC.

6.      The Applicant shall revise the grading plan to reduce the extent of grading to the satisfaction of the Aldasoro Field Operations Supervisor.

7.      The DRB approves the landscaping plan dated 06/15/2020 that shows 20 blue spruce trees.

2nd by Craig

The Motion was approved 3-0

109.    At present, the Defendants have approved and authorized an improper BSR and granted Limited Waivers to Lot 51 at the expense, injury and damage to Lot 50. The conduct and approvals were in breach of Governing Documents, violate applicable Colorado laws and statutes and while not required, in large part, for purposes of Das' requested relief were arbitrary and/or capricious and willful and/or wanton.

110.    The conduct of the BOD Defendants and DRB Defendant was both wanton and willful and done with the intent to harm and injure Das.

111.    As a direct result and proximate cause and/or producing cause, Das has been injured and damaged and is required to file suit to seek available remedies and compensation.

**M.    Defendant Wright Recusal**

112.    On May 10, 2019, Das filed a Request for Recusal of DRB Member Jodie Wright ("Wright") as to Pending Building Site Relocation of Lot 51.

113.    Design Regulation Section 8.14 DRB **Procedural Rules.** states:

When reviewing any Application required to be presented to and acted upon by the DRB in accordance with the Governing Documents and these Design Regulations, the DRB shall adhere to the following procedural requirements, in addition to the other requirements provided for herein:

A.      The **DRB shall identify any potential conflicts of interest that would pose a bias for or against** the pending Application and shall recuse himself/herself from considering the

Das Complaint.docx
2402908.1

Application. Grounds for bias and recusal would include: (i) ownership of property for which notice of the Application was required to be sent to the DRB member or their immediate family (ie. husband/wife, parents, children, siblings) or (ii) ongoing business relationships with the Applicant or an adjacent owner opposing the project.

114.    Despite this DRB requirement and similar requirements in the Governing Documents, the DRB and later the BOD Defendants never undertook this duty and never addressed the Das' request to recuse Wright from the proceedings.

115.    At the time of Das' recusal request, public records, including Cause No. 2017-CV03-0017, styled *Martin Silver, et al. vs. Aldasoro Ranch Homeowners Company, et al.*, filed in the San Miguel County District Court ("Action"), confirmed that Wright was a named defendant in said Action. Said Action involved her direct participation, in or around the fall of 2016, as an owner of Lot 77 submitting a Building Site Application to move the location of the original Building Site Boundary for Lot 77 from the far east side of the Lot to the far west side of the Lot ("First Site Relocation Application").

116.    Subsequently, in around early 2017, Wright made another Building Site Relocation request to again relocate the Building Site Boundary after approval of the first request ("Second Site Relocation"). Both Building Site Relocation requests were objected to by adjoining Lot Owners Burke and Silver (Lots 78 and 76) - based on claims of adverse impacts and misrepresentations by the Wrights. Additionally, Wright was named as a defendant in the Action in her capacity both as an architect and representative of Lot 63 involving another Building Site Relocation. The Lot 63 Building Site Relocation was objected to by Lots 80, 81 and 167. Without opining as to the validity of the allegations set forth in the Action, the public records and verified pleadings in the Action confirm Wright has what would constitute, at a minimum, a bias for

granting building site relocation(s) and as such, the pending Application for Lot 51's Building Site Relocation would warrant a recusal and present a potential conflict of interest on the part of Wright.

117.    DRB Regulation 8.14 DRB Procedural Rules., states in relevant part: A. "The DRB shall identify any potential conflicts of interest that would pose a bias for or against the pending Application and shall recuse himself/herself from considering the Application."

118.    Furthermore, various portions of the Second Amended and Restated Governance Policies and Procedures of the Aldasoro Ranch Homeowners Company, dated May 24, 2018, which incorporate by reference Governing Documents and applicable Colorado law, support a basis for Wright's recusal.

119.    Excerpts from the DRB hearing of July 9, 2019 confirm:

| Jodie Wright | Is this the exact house that you want, no matter what? . . . That is the question you should be asking. |
| Jennifer DiFiore | It's funny, because I actually, **I talked to several architects before I ended up choosing, one was your husband** and he actually drew me some boxes very similar to this. It's just how it flows on the hillside and the topography. And yes, I want my three bedrooms upstairs because I want to be in the bedrooms with my children. So I do want that, I think that we should be all on the same level. We have small kids. |
| Jodie Wright | **I don't think anyone here is not entertaining not moving the site seriously.** |

120.    Jodie Wright, along with her husband, Bruce Wright, own One Architects. If Wright's firm was involved in consultation with respect to Brand's house design (as confirmed by Brand's principal - Jennifer DiFiore at the July 9, 2019 DRB Meeting), the same should have required a recusal of Wright.

121.     With respect to another application of a homeowner (Lot 26), which withdrew its request for a BSR after objection by a neighbor, Wright made open comments reflecting her bias for BSRs.

122.     While making decisions as to Lot 51's BSR Application and Limited Waivers, Wright also continued without supporting documentation or justification to seek extensions of her own BSR on Lot 77, which was been extended well beyond the one (1) year period provided for in the Governing Documents.[9]

123.     DRB Regulation Section 8.12.6 Further Requirements. Subpart D states:

> Any DRB Approval of a Building Site Enlargement or a Building Site Relocation shall be contingent on the Applicant constructing only the Residence and other Improvements reflected in the approved Final Design Review Plan and construction commencing within one year of the DRB's final action on a Final Design Review Plan, unless the DRB, in its discretion, grants an extension **for good cause shown by the Applicant.**

124.     This DRB without any demonstration or finding of "good cause" by (Wright, owner of Lot 77) and as a way of ARHOC repaying her service to the DRB granted two (2) extensions to Wright of her own BSR with respect to her own Lot 77.

125.     Contrary to DRB Regulations, including 8.14 DRB Procedural Rules., which state in relevant part: A. "The DRB shall identify any potential conflicts of interest that would pose a bias for or against the pending Application and shall recuse himself/herself from considering the Application."  Wright nor the DRB identified or even inquired about any of these conflicts.

---

[9] DRB Minutes of September 24, 2019.

126.     Instead, Wright decided on her own that she had had no conflict, no bias and proceeded to invoke her bias and prejudice with respect to BSRs and Limited Waivers in the granting of Lot 51's BSR and Limited Waivers.

127.     Additionally, the ARHOC Governing Documents lack any procedure or process to appeal or have the BOD review or consider an Owner's request for a recusal of a BOD Director to DRB Member.

128.     Of interest, when the matter was sent back to the DRB for implementation and enforcement of the BOD's Final Decision of April 23, 2020 Wright chose (without a stated reason) to recuse herself from further proceedings.

**N.     Das' Requests for Inspection and Copying**

129.     Das made the following Demands for Inspection and Copying of Records pursuant to C.R.S. §§ 7-136-102 and 38-33.3-317 on: (1) September 30, 2019 - Original Demand for Inspection and Copying of Records ("Original Demand"); (2) September 25, 2020 - Supplemental Demand for Inspection and Copying of Records ("Supplemental Demand"); and (3) October 16, 2020 - 2nd Supplemental Demand for Inspection and Copying of Records ("2nd Supplemental Demand"), all of which are hereinafter sometimes collectively referred to as "Demands for Inspection and Copying of Records."

130.     ARHOC Defendant, despite being granted extensions and making agreements to provide responsive documents, failed to adequately and timely comply with Das' Demands for Inspection and Copying pursuant to C.R.S. §§ 7-136-102 and 38-33.3-317. Said failures continue to present.

131.    While C.R.S. §§ 7-136-102 and 38-33.3-317 contemplate producing documents for inspection and copying, the ARHOC Defendant chose to produce (with the exception of the Original Demand) all documents and records in a format similar to a request for production and by way of a document dump.

132.    The documents and records made available for inspection and copying in response to the Original Demand were after notice of inadequate production for inspection and copying, also reproduced with additional documents by way of an electronic dump <u>without</u> bates #s on October 12, 2020 (link download folder dated October 9, 2020). The same documents, with additional documents were produced via a link with referenced bates #s on November 13, 2020. After continued demands and requests, including reference to specific items that had not been produced, a few additional documents were produced on November 23, 2020, with bates #s and then on November 25, 2020, five (5) audio files of BOD Regular Sessions were produced.[10]

133.    Despite choosing to produce documents in a format contemplated by Fed. R. Civ. P. 34 and C.R.C.P. 34, the ARHOC Defendant failed to organize and label documents and items to correspond to with the categories in the request.

134.    Said Rules state in relevant part:

> Fed. R. Civ. P. 34(b)(E) Producing the Documents or Electronically Stored Information. (i): A party must produce documents as they are kept in the usual course of business or **must organize and label them to correspond to the categories in the request**; . . . .

> C.R.C.P. 34 (b) Procedure: An objection must state whether any responsive materials are being withheld on the basis of that objection. . . .

---

[10] While the ARHOC Defendant did reproduce documents and records well beyond the required time period with bates #'s, many of the documents produced and then reproduced still have no bates #"s.  Additionally, numerous documents that have been produced bear the same bates #'s.

> A party who produces documents for inspection shall produce them as they are kept in the usual course of business or **shall organize and label them to correspond with the categories in the request.**

135.     In addition to failures to produce requested and required documents and records, the ARHOC has wrongfully and without complying with required notice and procedural requirements for an executive session, withheld documents under the umbrella of "executive session."  Homeowner associations have been held to be "quasi-governmental functions" *Colo. Homes, Ltd. v. Loerch-Wilson*, 43 P.3d 718, 722 (Colo.App.2001).

136.     By way of example, prior to raising the issue by Das, the ARHOC Defendant's notice as to "executive session" provided as follows:

> Go into Executive Session According to Section 7.3.1 (b) consultation with legal counsel concerning disputes that are the subject of pending or imminent court proceedings or matters that are privileged or confidential between attorney and client.[11]

---

[11] The ARHOC 2nd Amended Governing Policies state in relevant part: 7.3. **Executive for Closed) Session.**

7.3.1.        When executive or closed sessions are permitted by law, the board should move into executive (closed) session before formal adjournment. All Members must be asked to leave except for those having a reason to participate (such as witnesses at a rule violation hearing). **Only the statutory exceptions are good cause for moving into executive session. The board should announce to the Members the purpose of the executive session.** The members of the board or any committee thereof may hold an executive or closed door session and may restrict attendance to executive board members and such other persons requested by the executive board during a regular or specially announced meeting or a part thereof. The matters to be discussed at such an executive session or closed session are limited to:

(a)  matters pertaining to employees of the HOC or the managing agent's contract, or involving the employment, promotion, discipline, or dismissal of an officer, agent, or employee of the HOC;

(b)  consultation with legal counsel concerning disputes that are the subject of pending or imminent court proceedings or matters that are privileged or confidential between attorney and client;

(c)  investigative proceedings concerning possible or actual criminal misconduct;

(d)  matters subject to specific constitutional, statutory, or judicially imposed requirements protecting particular proceedings or matters from public disclosure;

(e)  any matter the disclosure of which would constitute an unwarranted invasion of individual privacy; and

(f)  Review of or discussion relating to any written or oral communication from legal counsel.

Das Complaint.docx
2402908.1

137.   Following notice and inquiry by Das as to executive session and request for documents, the ARHOC Defendant changed its notice as to "executive session" by providing the following:

> 12.   Go into Executive Session According to Section 7.3.1 (a) matters pertaining to employees of the HOC or the managing agent's contract or involving the employment, promotion, discipline, or dismissal of an officer, agent, or employee of the HOC; (b) consultation with legal counsel concerning disputes that are the subject of pending or imminent court proceedings or matters that are privileged or confidential between attorney and client
> 12.1.   Lot 50-Das Records Request and Claim
> 12.2.   Lot 50-51 Das Mediation
> 12.3.   Budget and Personnel Discussion.

138.   ARHOC Defendant has also wrongfully and in direct violation of C.R.S. § 38-33.3-308. Meetings. excluded attendance of Das under improperly designated "executive" and/or a "closed door session" with respect to matters that form the basis of her claims.  In this regard, the ARHOC Defendant has also improperly adopted one (1) or more rules or regulations during an executive session and failed to announce and disclose the general matter of discussion of executive and closed sessions.

---

7.3.2.      Upon the final resolution of any matter for which the board received legal advice or that concerned pending or contemplated litigation, **the board may elect to preserve the attorney-client privilege in any appropriate manner, or it may elect to disclose such information, as it deems appropriate, about such matter in an open meeting**.

7.3.3.      Upon the final resolution of any matter for which the board received legal advice or that concerned pending or contemplated litigation, the board may elect to preserve the attorney-client privilege in any appropriate manner, or it may elect to disclose such information, as it deems appropriate, about such matter in an open meeting. (sic)

7.3.4.      **No rule or regulation of the board or any committee thereof shall be adopted during an executive session.** A rule or regulation may be validly adopted only during a regular or special meeting or after the body (sic) goes back into regular session following an executive session.

7.3.5.      **The minutes of all meetings at which an executive session was held shall indicate that an executive session was held, and the general subject matter of the executive session.**

139.     Das seeks production of all requested documents and records and attorneys' fees and costs for Defendant ARHOC's failure under applicable provisions and sections of CCIOA and the Colorado Nonprofit Act.

## IX.
## General Statement as to All Claims for Relief

140.     Das incorporates by reference the facts and allegations set forth above as if fully set forth herein as to all claims for relief pleaded herein and as the same may be amended during the discovery phases of this case.

141.     Additionally, all causes of action and counts are pleaded in the alternative and without conflict or waiver as to election by Das after the conclusion of this matter and before the entry of any judgment or trial on the merits.

## X.
## FIRST CLAIM FOR RELIEF
## (Breach of Contract [Governing Documents] – ARHOC Defendant)

142.     Das incorporates her allegations in the above paragraphs as if fully set forth herein.

143.     When Das acquired Lot 50, she entered into a set of integrated contractual relationships with the ARHOC Defendant, as set forth in the Governing Documents and pursuant to C.R.S. §§ 38-33.3-101, *et seq*. ("CCIOA").

144.     Due to Defendant ARHOC's (directly and by and through its BOD, DRB, employees, staff, servants and agents) breaches, Das sues for breach of contract.

145.     Das at all times fulfilled her end of the contract or any non-performance was justified or excused.

146.     Defendant ARHOC failed to fulfil its end of the contract and in fact knowingly and intentionally engaged in material breaches.

147.    The Governing Documents at all times imposed and required, *inter alia*, duties and obligations upon Defendant ARHOC  as well as the BOD, DRB and the Association Staff with respect to implementation and enforcement of Governing Documents, including the handling of BSRs and Limited Waivers and recusals. The Governing Documents required, among other things, Defendants to act at all times in good faith and in fairness to ensure that the rights of Das were not violated and to protect and preserve her privacy rights, her property value, and her other  property rights (including enjoyment and use) in Aldasoro Ranch.

148.    Despite these contractual duties and obligations, Defendant ARHOC knowingly and intentionally and through the actions and conduct of BOD Defendants and DRB Defendant which was done with wanton and willful conduct, breached implied and actual contractual agreements, causing damage, harm and injury to Das.

149.    As a result of the breaches, Das suffered damages for which she now files suits and seeks recovery in an amount to be proven at trial.

## XI.
## SECOND CLAIM FOR RELIEF
### (Breach of CCIOA – ARHOC Defendant)

150.    Das incorporates her allegations in the above paragraphs as if fully set forth herein.

151.    Defendant ARHOC as well as the conduct of Defendants Holbrook, Jemison, Loesekan and Wright are governed, in part, by the Colorado Common Interest Ownership Act (CCIOA). CCIOA (as amended by the Governing Documents to the extent they create greater obligations and duties of the Defendants and provide greater protections to Das) impose duties, restrictions and obligations upon the Defendants, including the BOD, DRB, the Association Staff and Owners.

152.    C.R.S. § 38-33.3-114 requires all remedies under CCIOA "shall be liberally administered to the end that the aggrieved party is put in as good a position as if the other party had fully performed."

153.    Defendant ARHOC's conduct and actions (directly and by and through its BOD, DRB, employees, servants and agents) as set forth above, including but not limited to with respect to policies and procedures as well as the failure to adopt, adhere to and comply with policies and procedures with respect to the granting of the subject BSR, Limited Waivers and lack of recusal of Jodie Wright are in violation of CCIOA and other applicable law.

154.    Among other things, CCIOA requires the Defendants to protect and preserve the property, property values and property rights of an Owner in a Community, such as Aldasoro Ranch, and that of a property owner, such as Das. CCIOA also imposes other obligations and duties, including but not limited to "good faith" and "fair dealing" with owners, such as Plaintiff.

155.    C.R.S. § 38-33.3-308. Meetings sets forth, *inter alia*, specific requirements, including when and for what purpose meetings of members of the executive board [BOD] may hold an executive or closed door session and may restrict attendance.

156.    In the case at hand, ARHOC and BOD failed to follow and adhere to said requirements and in fact, contrary to said provisions, adopted rules and regulations during executive sessions.  Said rules and/or regulations were not then validly adopted during a regular session and the chair [Holbrook] failed to announce the general matter of discussion.

157.    Defendant ARHOC breached its statutory duties to Plaintiff.

158.     Das has been damaged by Defendant ARHOC's various breaches and violations of

applicable CCIOA provisions with respect to the matters at issue and the subject conduct detailed

above in an amount to be determined at trial.

## XII.
## THIRD CLAIM FOR RELIEF
### (Breach of the Nonprofit Act – ARHOC Defendant)

159.     Das incorporates her allegations in the above paragraphs as if fully set forth herein.

160.     Defendant ARHOC is a Colorado Nonprofit Corporation. The Colorado Nonprofit

Act requires compliance with certain policies and procedures with respect to the operation and

conducting of business, including disclosure, providing notice of meetings - including but not

limited to special meetings - and conduct and activity of directors, such as the BOD Defendants

and DRB Defendant and Staff of the ARHOC.

161.     The Colorado Nonprofit Act also sets forth standards of conduct of directors and

officers (as well as agents and representatives – such as Wright – appointed by the directors). Said

duties and obligations require the directors and officers to discharge duties: (a) in good faith; (b)

with the care an ordinary prudent person in a like position would exercise under similar

circumstances; and (c) in a manner the director or officer reasonably believes to be in the best

interests of the nonprofit corporation.

162.     Defendant ARHOC's (directly and by and through its BOD, DRB, employees,

servants and agents) conduct, *inter alia*, as set forth above with respect to conducting (including

lack of required notice, lack of disclosure and wrongful classification of "executive session") of

meetings, including the holding of special meetings, the appointment of DRB Member Craig

Spring and the granting of the subject BSR, Limited Waivers and lack of recusal of Wright are in violation of the Colorado Nonprofit Act and other applicable law.

163.     The Association - Defendant ARHOC - further breached its obligations under the Nonprofit Act by failing to promulgate, follow and publish rules and regulations for appealing a request for a recusal of a DRB Member, such as Wright, with respect to a BSR and Limited Waiver, effectively denying Das' rights of adequate, fair, initial reviews and then independent appeals by the BOD summarily removing all independent DRB members and stepping into roles of a combined DRB/Board.

164.     Das has been damaged by the various breaches and violations of the Colorado Nonprofit Act by the Defendants in an amount to be determined at trial.

## XIII.
## FOURTH CLAIM FOR RELIEF
### (Breach of Duty of Good Faith and Fair Dealing – ARHOC Defendant)

165.     Das incorporates her allegations in the above paragraphs as if fully set forth herein.

166.     When Das acquired Lot 50, she entered into a set of integrated contractual relationships with ARHOC, as set forth in the Governing Documents and pursuant to CCIOA. *See* C.R.S. §§ 38-33.3-101, *et seq.*

167.     The duty of good faith and fair dealing is implied in all contracts in Colorado and is also specifically mandated by CCIOA, C.R.S. § 38-33.3-113. which imposes an obligation of good faith in the performance and/or enforcement of all duties and contracts governed under CCIOA. Directors of homeowners associations also have a duty to deal with utmost good faith and have a duty to deal impartially with the beneficiaries (homeowners), such as Das. *Woodward v. Bd. of Dirs. of Tamarron Ass'n of Condo. Owners*, 155 P.3d 621, 624 (Colo. App. 2007).

168.    Defendant ARHOC at all times maintained discretion in its interpretation and enforcement of the Governing Documents.

169.    Based on the above-described conduct, events and acts, ARHOC breached duties of good faith and fair dealing under the Governing Documents and CCIOA with respect to Das.

170.    ARHOC was aware that Das would be damaged and injured by allowing a BSR and Limited Waivers over objections. ARHOC was also aware or should have been aware that the granting of a BSR and Limited Waivers under the Governing Documents, especially with respect to Lot 51 and the already close proximity of the existing building circle on Lot 51 to Lot 50, created an unconscionable result.

171.    Based on the above-described conduct, events, and acts of ARHOC, ARHOC breached duties of good faith and fair dealing by failing to, among other things:

    (a)    act at all times in good faith and in fairness to ensure that the rights of each Owner, including Das, were not violated by, for example, enforcing all covenants, conditions, restrictions, easements, uses, limitations, obligations set forth in the Articles of Incorporation, the Declaration, the Bylaws or otherwise, including Article 4.1 and the Building Site Covenants and any regulations promulgated by the DRB;

    (b)    to protect and preserve the property, property values and property rights in Aldasoro Ranch for Owners, such as Das;

    (c)    preserve and enhance the views, privacy, visual impact and values of the Lots;

    (d)    require Brand, as the owner of Lot 51, to carry its burden by a preponderance of the evidence to "show cause" for the BSR and Limited Waivers;

    (e)    recuse Wright from participating in the subject matter; and

    (f)    generally act within allowed authority and not in any manner "arbitrary or capricious" and in violation of Governing Documents

setting forth and adopting negligence standards – care an ordinarily prudent person in a like position would use under similar circumstances.

172.     Defendant ARHOC's interpretation and enforcement of the Governing Documents violated Das' justified expectations under the Governing Documents.

173.     Das suffered damages as a result of ARHOC's breach of duty of good faith and fair dealing in an amount to be proven at trial.

## XIV.
## FIFTH CLAIM FOR RELIEF
### (Failure to Produce Requested Documents and Records for Inspection and Duplication – ARHOC Defendant)

174.     Das incorporates her allegations in the above paragraphs as if fully set forth herein.

175.     Das made Demands for Inspection and Copying of Records Pursuant to C.R.S. §§ 7-136-102 and 38-33.3-317 on Defendant ARHOC on September 30, 2019, September 25, 2020 and October 16, 2020 ("Demands for Inspection and Duplication").

176.     Defendant ARHOC failed to timely produce documents in response to Demands for Inspection. Additionally, Defendant failed to produce all required and requested documents and records.

177.     Defendant ARHOC, without identifying a basis or providing a privilege log as to withheld documents, wrongfully withheld documents including under the auspicious and umbrella of "executive session." While doing so, Defendant ARHOC failed to comply with required notice and procedural requirements to hold and conduct executive sessions.

178.     Additionally, topics discussed during claimed executive sessions, based on ARHOC Defendant's claimed status as a nonprofit entity, were improper and wrongful.

179.     Das seeks specific performance of full compliance with respect to her previous Demands for Inspections and Copying of Records and all associated attorneys' fees and costs in seeking enforcement and compliance as awardable under CCIOA.

## XV.
## SIXTH CLAIM FOR RELIEF
### (Declaratory Judgment – ARHOC Defendant)

180.     Das incorporates her allegations in the above paragraphs as if fully set forth herein.

181.     There is an actual and present controversy between the parties regarding the granting of the subject BSR and Limited Waivers as well as the enforceability of the ARHOC Governing Documents which allow a BSR and the granting of Limited Waivers without approval or consent of an adjoining and impacted property owner, such as Das (Lot 50).

182.     In enacting BSR and Limited Waiver Provisions, Defendant ARHOC knew or should have known that it would impact owners such as Das (from both an economic and enjoyment and privacy basis). In fact, Governing Documents acknowledge such harm to Das.

183.     Moreover, Das repeatedly objected to the BSR and Limited Waiver process, and the Defendants conduct but Defendant ARHOC (directly and by and through the BOD and DRB) consistently denied the requests to cease and continued to cause injury, damage and harm to Das.

184.     Additionally, Defendant ARHOC failed to comply with Das' Demands for Inspection and Copying of Records Pursuant to C.R.S. §§ 7-136-102 and 38-33.3-317 and violated C.R.S. § 38-33.3-308.

185.     Pursuant to 28 U.S.C. §§ 2201, *et seq.* and Federal Rule of Civil Procedure 57, Das is entitled to a declaration of the Court stating that Defendant ARHOC failed to comply with Das' Demands for Inspection and Copying of Records Pursuant to C.R.S. §§ 7-136-102 and 38-33.3-

317; violated C.R.S. § 38-33.3-308; violated its Governing Documents by granting and/or permitting a BSR and Limited Waivers over objection of an adjoining property owner (such as Das); and that the ARHOC approvals are invalid and unenforceable because the process and decisions were arbitrary, capricious, and irrational under applicable due process standards and amount to, in essence, a wrongful taking of Das' property without just compensation to Das.

## XVI.
## SEVENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duties – All Defendants)

186.    Das incorporates her allegations in the above paragraphs as if fully set forth herein.

187.    Based on the special relationship between Das and the Defendants, the status of the BOD Defendants and DRB Defendant, and based on the confidential relationship between the parties, fiduciary duties were owed by Defendants Holbrook, Jemison, Loesekan and Wright to Das. These duties, some of which are set forth in the Governing Documents, required duties, *inter alia*, of: (a) loyalty; (b) to exercise reasonable care and skill; (c) and to deal impartially with beneficiaries such as Das.

188.    Homeowners associations along with directors have been held to have fiduciary duties.  Colorado courts have recognized homeowners' associations have a fiduciary duty to their members that "arises based upon policy considerations that are independent of any contract." *Colorado Homes, Ltd. v. Loerch-Wilson*, 43 P.3d 718, 722 (Colo. App. 2001) (noting with approval that courts in other jurisdictions have imposed this duty "in recognition of the power held by homeowner associations, the quasi-governmental functions they serve, and the impact on value and enjoyment that can result from the failure to enforce covenants").

189.     As to the BSR and Limited Waivers and Wright's recusal, Defendants in this matter were acting as a fiduciary to Das.

190.     Defendant Wright also breached fiduciary duties (including by way of negligent misrepresentations and failures to disclose) with respect to her involvement in the ARHOC BSR and Limited Waiver process in general and the proceedings at issue; her involvement with the Lot 51 Applications; and her bias and prejudice with respect to BSRs and Limited Waivers resulting and culminating with the Aldasoro Ranch Company Board of Directors Final Decision regarding the Lot 51 Building Site Relocation of April 23, 2020.

191.     Defendant Wright gave false information and/or failed to provide required information to Das and the ARHOC Staff during DRB Meeting(s) as to her bias in favor of liberally granting BSR and Limited Waivers, that she wanted modifications to Governing Documents (including DRB regulations as to design), and that she had no bias or conflict. Wright's conduct also, to the extent necessary and in the case at hand, was willful, intentional and/or wanton.

192.     Defendants in allowing the BSR and Limited Waivers and in refusing to recuse Defendant Wright, breached their fiduciary duties to Das.

193.     As a direct and proximate result and cause of the breached duties, Das suffered resulting damages and injuries.

## XVII.
## EIGHTH CLAIM FOR RELIEF
### (Private Nuisance – All Defendants)

194.     Das incorporates her allegations in the above paragraphs as if fully set forth herein.

195.     The conduct of the Defendants with respect to the granting of a BSR and Limited

Waivers constitutes a substantial invasion of Das' interest in the use and enjoyment of her property

and constitutes nuisance as defined under Colorado law.  *Woodward,* 155 P.3d at 628.

196.     The conduct of the Defendants was: (a) an intentional invasion of Das' interest; (b)

a negligent invasion of Das' interest; and/or conduct so dangerous to life or property and so

abnormal or place in its surroundings as to fall within the principles of strict liability.

197.     The conduct of Defendants amounts to and constitutes an unreasonable interference

with Das' use and enjoyment of her property.

198.     As a result and proximate and/or producing cause, Das has been damaged and seeks

just compensation.

## XVIII.
## NINTH CLAIM FOR RELIEF
### (Unjust Enrichment – ARHOC Defendant)

199.     Das incorporates her allegations in the above paragraphs as if fully set forth herein.

200.     The ARHOC Defendant's conduct and the relief granted by way of the Aldasoro

Ranch Company Board of Directors Final Decision - Lot 51 Building Site Relocation of April 23,

2020, results in an unjust enrichment to the Aldasoro Community, and in unfair treatment and

detriment to Das, owner of Lot 50.

201.     ARHOC, per the Governing Documents owns numerous Lots and parcels of land

some of which are designated as open space in the Aldasoro Community.  The Aldasoro Ranch

Company Board of Directors Final Decision regarding Lot 51 Building Site Relocation of April

23, 2020, cites numerous benefits and positive impacts on the Aldasoro Community as a basis for

approval and granting the subject BSR. However, no mention is made with respect to the negative impact and expense to Das. No mention is made of compensation to Das.

202.    The claim of unjust enrichment is a legal claim in quasi-contract for money damages based upon principles of restitution. "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." Restatement of Restitution § 1 (1937). The comment to this section explains that "[a] person is enriched if he has received a benefit. A person is unjustly enriched if the retention of the benefit would be unjust." Restatement of Restitution § 1 cmt. a (1937).

203.    When restitution is the primary basis of a claim, as opposed to a remedy for bargains gone awry, it invokes what has been called a "contract implied in law." *Ninth Dist. Prod. Credit Ass'n v. Ed Duggan, Inc.*, 821 P.2d 788, 794-95 (Colo. 1991) (characterizing an unjust enrichment claim as a contract implied in law).

204.    A claim for unjust enrichment in the context of associations has been recognized by the Colorado Supreme Court. *DCB Construction Co., Inc. v. Central City Development Co.*, 965 P.2d 115 (Colo. 1998); *Cablevision of Breckenridge, Inc. v. Tannhauser Condominium Ass'n*, 649 P.2d. 1093, 1096 (Colo. 1982). The unjust enrichment claim in the context of a contract implied in law does not depend in any way upon a promise or privity between the parties. *Wistrand v. Leach Realty Co.*, 364 P.2d 396, 397 (Colo. 1961). "[T]he claim arises, 'not from consent of the parties, as in the case of contracts, express or implied in fact, but from the law of natural immutable justice and equity.'" *DCB Constr.*, 940 P.2d at 962 (citing *Valley Realty & Inv. Co. v. McMillan*, 414 P.2d 486, 488 (Colo. 1966)). Thus a "contract implied in law" is not really a contract at all, and may even be imposed in the face of a clearly expressed contrary intent if justice requires.

205.     The elements of the claim (which are present in the case at hand) are based upon the principles stated in the Restatement of Restitution § 1, and have previously been expressed as follows: (1) that a benefit was conferred on the defendant by the plaintiff, (2) that the benefit was appreciated by the defendant, and (3) that the benefit was accepted by the defendant under such circumstances that it would be inequitable for it to be retained without payment of its value. *Cablevision of Breckenridge,* 649 P.2d at 1093.

206.     Under this claim, Das seeks relief and remedy under case law and equity to be compensated for the benefit set forth in the Aldasoro Ranch Company Board of Directors Final Decision regarding Lot 51 Building Site Relocation of April 23, 2020 to the Aldasoro Community at the expense and injury of Das.

207.     Specifically, the Aldasoro Ranch Company Board of Directors Final Decision - Lot 51 Building Site Relocation of April 23, 2020  states that the granting of  the subject BSR results in benefits and positive impacts  to the Aldasoro Community, without reference to the expense and detriment of  Das.

208.     Das asserts the benefits provided under the Aldasoro Ranch Company Board of Directors Final Decision- Lot 51 Building Site Relocation of April 23, 2020 to ARHOC are unjust for the Aldasoro Community to retain without commensurate compensation to Das.

209.     Under this claim, Das seeks recovery for the unjust benefit provided at the expense of Das and seeks just compensation and payment of damages.

## XIX.
## VICARIOUS LIABILITY

210.     In addition to direct liability, ARHOC is responsible for and liable for (including by through their conduct) of its agents, servants, directors, members and employees, including but

not limited to the BOD Defendants, Defendant Wright and Pamela Bennett, Manager of Defendant

ARHOC during relevant periods of time. To the extent Defendant ARHOC does not agree and

stipulate to liability for the conduct of Pamela Bennett in this matter and/or the discovery process

reveals that that her conduct was outside the course and scope of her employment or authority, Das

reserves the right to join Pamela Bennett as a party to this action.

211.    Additionally, the BOD Defendants in addition to direct liability are responsible for

DRB Members, including Defendant Wright who they appointed, failed to recuse and allowed to

participate in the BSR and Limited Waiver requests to the detriment and injury of Das.

212.    Said Defendants are responsible for their own breaches, conduct and negligence, as

well as that of their employees and/or servants and/or agents who are its actual agents, apparent

agents, ostensible agents, agents by estoppel acts and/or omissions under all applicable doctrine,

including under the doctrines of *respondeat superior*, corporate negligence, statutory regulations,

apparent or ostensible agency, agency by estoppel, and violation of non-delegable duties.

## XX.
## ATTORNEYS' FEES AND COURT COSTS

213.    Das asserts that the conduct, acts, omissions, commissions and activities of the

Defendants that form the basis, in whole and in part, for all asserted claims for relief were a

proximate, producing and/or resulting cause of Das' injuries and damages for which she seeks

relief.

214.    Das is entitled to costs and counsel fees under, *inter alia*, C.R.S. § 7-136-104(3)(a),

which states:

> (3)     If a court orders inspection or copying of the records demanded,
> unless the nonprofit corporation proves that it refused inspection or copying
> in good faith because it had a reasonable basis for doubt about the right of

the member, or the member's agent or attorney, to inspect or copy the records demanded:

(a)     The court shall also order the nonprofit corporation to pay the member's costs, including reasonable counsel fees, incurred to obtain the order;

(b)     The court may order the nonprofit corporation to pay the member for any damages the member incurred;

(c)     If inspection or copying is ordered pursuant to subsection (2) of this section, the court may order the nonprofit corporation to pay the member's inspection and copying expenses; and

(d)     The court may grant the member any other remedy provided by law.

215.     Further, Das seeks attorneys' fees and costs pursuant to CCIOA under C.R.S. § 38-33.3-123, which states:

. . .

(b)     For any failure to comply with the provisions of this article or any provision of the declaration, bylaws, articles, or rules and regulations, . . . , any unit owner, or any class of unit owners adversely affected by the failure to comply may seek reimbursement for collection costs and reasonable attorney fees and costs incurred as a result of such failure to comply, without the necessity of commencing a legal proceeding.

(c)     In any civil action to enforce or defend the provisions of this article or of the declaration, bylaws, articles, or rules and regulations, the court shall award reasonable attorney fees, costs, and costs of collection to the prevailing party.

(d)     Notwithstanding paragraph (c) of this subsection (1), in connection with any claim in which a unit owner is alleged to have violated a provision of this article or of the declaration, bylaws, articles, or rules and regulations of the association and in which the court finds that the unit owner prevailed because the unit owner did not commit the alleged violation:

(I)     The court shall award the unit owner reasonable attorney fees and costs incurred in asserting or defending the claim; . . . .

## XXI.
## JURY DEMAND

216.     Das demands a jury trial as to all issues so triable.

## XXII.
## PRAYER FOR RELIEF

217.    Das requests she be awarded the following relief:

(a)    enter judgment in favor of Das on all claims asserted herein;

(b)    award Das the injunctive relief sought;

(c)    award Das the declaratory relief as described above;

(d)    enter judgment in favor of Das on all of her claims against the Defendants, awarding Das her damages, costs, interest, and attorneys' fees pursuant to all applicable statutes (state and federal);

(e)    award Das the fees, costs and attorneys' fees incurred in connection with this matters pursuant to the Declaration and CCIOA and the Colorado Nonprofit Act;

(f)    for actual damages as allowed by law;

(g)    for consequential and compensatory damages as allowed by law;

(h)    for non-economic damages as allowed by law;

(i)    award Das any and all post-judgment interest awardable under Colorado law; and

(j)    award Das any and all such other and further relief, in equity and law, as this Court deems just and proper under the circumstances.

WHEREFORE, Das, while reserving all rights, respectfully prays for judgment against Defendants, jointly and severally, in favor of Das in an amount to be proven at trial, and for such other and further relief, general and special, legal and equitable, as this Honorable Court may deem just and proper.

DATE: February 1, 2021

Respectfully submitted,

 /s/ Micky N. Das
Christopher D. Bryan
Colorado Attorney Registration No. 35522
(Admitted to the United States District
Court for the District of Colorado)
GARFIELD & HECHT, P.C.
625 East Hyman Avenue, Suite 201
Aspen, Colorado 81611
(970) 925-1936 Telephone
(970) 925-3008 Facsimile
Email: cbryan@garfieldhecht.com

Micky N. Das
Texas Bar No. 05402300
(Admitted to the United States District
Court for the District of Colorado)
TYLER & DAS
1811 Bering Drive, Suite 225
Houston, Texas 77057
(713) 739-1900 Telephone
(713) 739-8347 Facsimile
Email: mdas@tylerdaslaw.com

*Attorneys for Plaintiff Andrea Das*